JAMES HOTEL COMPANY, TOWER CLUB, INC., AND PALACE BUILDING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 84544.   Filed October 16, 1962.

*Roy C. Lytle, Esq.*, for the petitioners.
*David E. Mills, Esq.*, for the respondent.

DAWSON, *Judge:* Respondent determined deficiencies in petitioners' income tax for the years and in the amounts as follows:

| Fiscal year ending Aug. 31— | Deficiency |
| --- | --- |
| 1955 | $48,250.90 |
| 1956 | 13,060.98 |
| 1957 | 7,561.62 |

The only issue involved is whether amounts paid to Tower Club, Inc., in excess of the par value of stock certificates, by persons seeking membership, constitute taxable income to Tower Club, Inc., or contributions to capital.

### FINDINGS OF FACT.

All of the facts are stipulated and are so found.

The James Hotel Company is a corporation organized and existing under the Oklahoma Business Corporation Act of the State of Oklahoma and was in existence during all times material herein.   It is the owner and operator of both the Skirvin Hotel and the Skirvin Tower Hotel located at Park Avenue and Broadway in Oklahoma City, Oklahoma.

Tower Club, Inc., was incorporated on April 6, 1954, under the Oklahoma Business Corporation Act and has been in existence from the date of incorporation to the present time.   It is the owner and operator of the Tower Club, whose place of business is in the basement of the Skirvin Tower Hotel.

Palace Building Company is an Oklahoma corporation organized under the Oklahoma Business Corporation Act.   It is a wholly owned subsidiary of the James Hotel Company and is involved in this litigation only incidentally through having filed a consolidated return with James Hotel Company and Tower Club, Inc.

The James Hotel Company and the Tower Club, Inc., filed consolidated income tax returns for the fiscal years ended August 31, 1955, and August 31, 1956, with the district director of internal revenue at Oklahoma City, Oklahoma. Those two corporations and the Palace Building Company filed a consolidated income tax return for the fiscal year ended August 31, 1957, with the district director of internal revenue at Oklahoma City, Oklahoma.

Prior to 1954, the basement of the Skirvin Tower Hotel was vacant and had not been finished. The officers of the James Hotel Company conceived the idea of an exclusive club to occupy the vacant basement space.

The Tower Club, Inc., was incorporated April 6, 1954, with an authorized capital of 1,000 shares of stock, all of the same class, with a par value of $10 per share.

On or about June 1, 1954, it having been determined that the plan of having the Tower Club was meeting with acceptance, work was begun on it in the basement of the Skirvin Tower Hotel. Shortly after Labor Day 1954 the club was opened, and it has operated since that date.

On October 26, 1954, the articles of incorporation of the Tower Club were amended to provide for an authorized capital stock of 1,500 shares, 500 shares to be designated as class A stock with no right to vote, and 1,000 shares to be designated class B stock with all of the voting rights. Both classes of stock were to have a par value of $10 per share. The articles, as first amended, further provided that there was to be no discrimination between class A and class B stock in respect to dividends or preferences on liquidation, either voluntary or involuntary. The sole difference between classes of stock was voting rights.

On August 29, 1955, the articles of incorporation of the Tower Club, Inc., were further amended. By the second amendment the authorized capital stock of the company was increased from 1,500 shares to 6,000 shares. Class A stock was increased from 500 shares to 5,000 shares; par value remained at $10 per share with no voting rights. Under the second amendment, however, class A stock was to be preferred as to dividends, being entitled to dividends of 6 percent of par in each year in which net earnings of the corporation after taxes would permit. Class A stock, under the second amendment, was to be preferred on liquidation and the holder of each share was to be entitled to have and receive the sum of $10 before any distribution in liquidation be made to class B stock. Class A stock was only to participate in liquidation to the extent of the par value thereof.

Under the second amendment to the articles of incorporation the number of shares of class B stock remained at 1,000 shares, par value $10, and retained all voting rights. The second amendment provided that the holders of class B stock would not be entitled to any dividends in any year until after the preferential rights of the class A stock were satisfied in full. It further provided that, on liquidation, class B stock would be entitled to receive liquidation dividends only after the holders of all of the class A stock shall have received the sum of $10 per share. At such time the holders of class B stock were to be entitled to all of the remaining dividends in liquidation.

The board of directors of the Tower Club, Inc., has always consisted of persons who were employed by, or were stockholders of, the James Hotel Company.

The stated purposes for which the corporation was formed were (a) to provide quarters for those persons having mutual interests, so that they might meet for their entertainment and convenience; (b) to buy, sell, produce, and prepare food products; (c) to provide all services generally furnished in clubs, restaurants, and other similar places; (d) to buy, rent, lease, or otherwise acquire, and to sell, exchange, or otherwise dispose of, real estate and improvements thereon; and (e) to do any other thing not prohibited by the laws of Oklahoma, or of the United States of America, in connection with its business aforesaid.

Persons who joined the Tower Club prior to August 31, 1955, were charged on the following basis:

|  | Class A | Class B | Class C |
| --- | --- | --- | --- |
|  | *Resident Oklahoma County* | *In-State nonresident* | *Out-of-State nonresident* |
| Federal tax | $350 | $150 | $100 |
|  | 70 | 30 | 20 |
| State tax | 7 | 3 | 2 |
|  | 427 | 183 | 122 |

Persons who joined the Tower Club subsequent to August 31, 1955, were charged on the following basis:

|  | Class A | Class B | Class C |
| --- | --- | --- | --- |
|  | *Resident Oklahoma County* | *In-State nonresident* | *Out-of-State nonresident* |
| Federal tax | $500 | $200 | $150 |
|  | 100 | 40 | 30 |
| State tax | 10 | 4 | 3 |
|  | 610 | 244 | 183 |

Prior to August 31, 1955, a class A membership (for a resident of Oklahoma County) was recorded on the books of the Tower Club as follows:

|  | Debit | Credit |
|---|---|---|
| Cash or bank | $427 | |
| Initiation fee A | | $350 |
| Accounts payable excise tax | | 70 |
| Accounts payable sales tax | | 7 |

Class B and C memberships (for in-State nonresidents and for out-of-State nonresidents, respectively) were similarly recorded.

In closing the books of the Tower Club at August 31, 1955, the following accounts were closed to capital accounts by the following adjustments:

|  | Debit | Credit |
|---|---|---|
| Initiation fee A (216) | $75,600 | |
| Initiation fee B (100) | 15,000 | |
| Initiation fee C (52) | 5,200 | |
| Capital stock—Class A | | $3,680 |
| Capital surplus | | 92,120 |

After August 31, 1955, membership fees were credited directly to capital accounts. The entry for a class A membership was:

|  | Debit | Credit |
|---|---|---|
| Cash or bank | $610 | |
| Capital stock | | $10 |
| Capital surplus | | 490 |
| Accounts payable taxes | | 110 |

One share of class A stock was issued to each member of the Tower Club whether he was a class A member (resident); class B member (in-State nonresident); or a class C member (out-of-State nonresident). No class A stock certificates were issued to members of the Tower Club until November of 1955. These certificates were dated either August 1, 1955, or November 1955.

On October 18, 1955, 4,000 shares of class A stock of Tower Club, Inc., were issued to James Hotel Company for $10 per share. On the same date, class B stock was issued to the following:

| Shareholder | Number of shares |
|---|---|
| Dan James | 1 |
| G. W. James | 1 |
| T. G. Stargel | 1 |
| Paul Banhart | 1 |
| James Hotel Company | 996 |
| Total | 1,000 |

The balance sheet of the Tower Club, Inc., at August 31, 1956, reflects:

Accounts payable—Trade $26,873.00

This account was designated on the books of Tower Club, Inc., as:

Accounts payable—Membership
Initiation fees—Excess Collected

and represented taxes collected as set forth in schedules above. On October 31, 1956, a check was issued to the district director of internal revenue for $25,851.39. The payment was designated on the corporation records as:

Excise tax_____ $1,221.39
Excise tax—Stock membership excess collected_____ 24,630.00
                                                       _____
                                                       25,851.39;

the difference between $26,873 and $25,851.39 apparently was payable to the State of Oklahoma.

The brochure used by the Tower Club contained the following information:

INITIATION FEES

|  | Resident Oklahoma County | In-State nonresident | Out-of-State nonresident |
| --- | --- | --- | --- |
| Init. fee | $500 | $200 | $150 |
| Fed. tax | 100 | 40 | 30 |
| State tax | 10 | 4 | 3 |
| Total | 610 | 244 | 183 |

MONTHLY DUES STRUCTURE

|  | Resident Oklahoma County | In-State nonresident | Out-of-State nonresident |
| --- | --- | --- | --- |
| Dues | $17.50 | $8.00 | $6.00 |
| Fed. tax | 3.50 | 1.60 | 1.20 |
| State tax | .35 | .16 | .12 |
| Total | 21.35 | 9.76 | 7.82 |

APPLICATION FOR MEMBERSHIP

Application should be made to the Board of Admissions. When application is approved, the stock membership certificate, and membership card will be issued.

CLUB HOURS

Food Service from 11:00 a.m.–10:00 p.m. Weekdays. 11:00 a.m.–10:30 p.m. Saturdays.
All other club facilities available at these hours. 10:30 a.m. to midnight—Monday thru Friday. Saturday—10:30 a.m.–1:00 a.m.
Closed Sundays.

MUSIC

Orchestra appears Weekdays 6:00 p.m.–midnight. Saturdays 7:00 p.m.–1:00 a.m.

JUNIOR MEMBERSHIPS

Junior Memberships are available to sons and daughters of members.

### GUEST CARDS

Guest Cards may be issued for a period of 3 days to any non-member residing outside of Oklahoma County.

### GENTLEMEN

Gentlemen are required to wear coats at all times. Neckties must be worn after 6:00 p.m.

### FOR ADDITIONAL INFORMATION

(Availability of stock memberships, additional club facilities, affiliated clubs, bylaws, special events, reservations private parties or special menus) please contact the Tower Club Manager, Skirvin Tower, Telephone CEntral 2–4555, Oklahoma City.

The application for membership in the Tower Club states that the information requested thereon is for the information of the directors of the club in connection with application for membership in the Tower Club. It further states at the bottom thereof that the initiation fee is due and payable upon approval of the application by the board of directors.

There are no members of the Tower Club except those who are stockholders, with the exception of a few honorary memberships which have been granted to persons who are prominent in the State of Oklahoma.

Any member obtaining food or refreshments is charged for the same. The amount of dues and proceeds from the sale of food or refreshment is charged to income. The cost of the food, the labor, and all other expenses are charged as expense items.

The cost of equipping the Tower Club and obtaining the fixed assets that were required was paid out of and charged against the paid-in surplus account on the records of the Tower Club. No part of the paid-in surplus has ever been used for the purpose of defraying operating expenses. The cost of equipping the Tower Club and obtaining its fixed assets exceeded the amount of paid-in surplus. The Tower Club obtained the necessary additional funds by borrowing from the James Hotel Company.

On December 10, 1958, after the initial revenue agent's report had been made, a letter was written to the stockholders of the Tower Club, Inc., asking them if they understood that they were making contributions to capital in the form of a paid-in surplus over and above the par value of the stock. The Tower Club sent 547 such letters to stockholders; 193 were signed and returned. However, there were no restrictions placed on the use of any amounts paid by members of the Tower Club.

OPINION.

Respondent agrees that $10 of the initial payment by each member of the Tower Club, which represented the par value of the stock, is a contribution to capital, but urges that the amounts in excess of par value are payments for goods and services to be rendered, and therefore, taxable as ordinary income.[1] Petitioners, on the other hand, contend that the payments are excludable from ordinary income as contributions to capital and rely on section 118(a) of the Internal Revenue Code of 1954.[2] Nowhere have the petitioners asserted that the *entire payments* were in exchange for stock.

We agree with the respondent. The well-settled principle "that the incidence of taxation depends upon the substance, not the form, of the transaction," is particularly applicable in this case. See *Commissioner* v. *Hansen*, 360 U.S. 446 (1959). The substance of the whole transaction discloses more of a seller-customer relationship between the petitioners and their club members than the usual corporation-stockholder relationship. We think the amounts here in issue were clearly in return for goods and services to be rendered and accordingly come within Income Tax Regs., section 1.118-1.[3]

In order to enjoy the services and facilities of the Tower Club, the members were required to pay an "initiation fee," as it was so designated in the Tower Club brochure, in the application for membership, and as originally entered on the corporate books. Where initial contributions are required as a condition to entitlement of services, they constitute payments for such services, and, as such, are taxable income to the corporation in the absence of evidence showing that the contributions are thereby entitled to benefits characteristic of a capital contribution so as to negate mere payment for services. *United Grocers, Ltd.* v. *United States*, 186 F. Supp. 724 (N.D. Cal. 1960).

The contribution in excess of the par value of stock, required of each member of the Tower Club, increased their equity interest in the corporation very little, if at all. Club members had no voice in the management of the corporation because all class B voting stock was held by the James Hotel Company, the parent corporation. In addi-

---

[1] SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

(1) Compensation for services, including fees, commissions, and similar items;

[2] SEC. 118. CONTRIBUTIONS TO THE CAPITAL OF A CORPORATION.

(a) GENERAL RULE.—In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer.

[3] SEC. 1.118-1. CONTRIBUTIONS TO THE CAPITAL OF A CORPORATION.

In the case of a corporation, section 118 provides an exclusion from gross income with respect to any contribution of money or property to the capital of the taxpayer. * * * However, the exclusion does not apply to any money or property transferred to the corporation in consideration for goods or services rendered, * * *

tion, the James Hotel Company held 4,000 of the 4,368 shares of class A nonvoting stock outstanding on August 31, 1955. The club members were limited to the extent of 6 percent on any dividends that might be declared. Moreover, the maximum distribution that could possibly be realized by each member on liquidation was $10, the par value of the stock. This relatively insignificant equity interest certainly does not negate the more obvious purpose of the contribution, i.e., payment for services.

Another factor strongly indicative of payment for services is that unequal amounts were required of the members depending upon residency in or out of the State of Oklahoma or Oklahoma County. It seems obvious that those members using the Tower Club most frequently were charged more and that the "initiation fees" were related directly to the amount of service each member was to receive. Petitioners cite *874 Park Avenue Corporation*, 23 B.T.A. 400 (1931), and *Cambridge Apartment Building Corporation*, 44 B.T.A. 617 (1941), where payments by shareholders in cooperative apartment houses were held to be capital contributions even though shareholders were assessed in relation to the size of apartments they leased. A careful reading of the cases, however, reveals that the tenants owned stock in proportion to the size of their apartments, thus enabling the cooperative to assess each shareholder on the basis of the number of shares he held. The distinguishing point in the case at hand is that all the members of the Tower Club owned only 1 share and yet were charged varying amounts as "initiation fees."

Petitioners stress that each member paid monthly dues and was charged for all the food and refreshments obtained at the club. A somewhat similar factual situation existed in *Teleservice Co. of Wyoming Valley*, 27 T.C. 722 (1957), aff'd. 254 F. 2d 105 (C.A. 3, 1958). Teleservice Company operated a community television service supplying a signal to persons in poor reception areas. To finance the construction necessary to build the system, contributions were solicited from subscribers. They were advised that the contributions were in aid of construction. The subscribers were charged monthly for television services received. Commercial contributors were charged an initial fee of $200 while residential contributors were charged only $145. On these facts we held that the contributions were the price for services as opposed to contribution to capital. For the purpose of determining the true nature of the contributions in excess of the par value of the stock in this case, we think the *Teleservice* decision is controlling. The principle is basically the same even though no stock was issued to the contributors in that case.

In their brief the petitioners state that it was the understanding of the club members that the amounts they paid would be used for capital

expenditures and that some of the money was, in fact, used in obtaining fixed assets and in equipping the Tower Club. They rely on *Paducah & Illinois Railroad Co.*, 2 B.T.A. 1001 (1925); *874 Park Avenue Corporation, supra,* and *Cambridge Apartment Building Corporation, supra.*

In the *Paducah* case, the contributions by the stockholders were dedicated by contract to capital expenditures and the corporation was, in turn, obligated to issue additional stock to the contributors. In *874 Park Avenue Corporation,* assessments or contributions on the part of the shareholders were earmarked for the purpose of amortizing mortgages on a cooperative apartment house. And in *Cambridge Apartment Building Corporation,* the stockholders had an understanding in prior years, as indicated by budgets, that a part of the assessments would be used to retire indebtedness. Thus, in each of these cases the contributions were *restricted* to use as capital expenditures, whereas, in the instant case, the parties have stipulated that there were *no restrictions* placed on the use of any of the contributions. This is the distinguishing feature, and the mere fact that the fees were used in capital expenditures does not change the nature of the payments. Furthermore, we are not convinced that the self-serving letter sent to the stockholders (members) of the Tower Club clearly shows "the understanding of a very substantial number" that they intended the amounts paid in excess of the par value of the stock to be a capital contribution. Petitioners admit that only 193 of 547 members so indicated.

Still other evidence which strikes at the very heart of petitioners' "contribution to capital" argument is that the James Hotel Company, a corporate entity unable to use the facilities of the club, was issued stock at par, while all other stockholder-members were required to pay the "initiation fee." After 1955, the "initiation fee" was raised. This was done even though at that time the Tower Club was fully equipped and apparently in no need of further capital expenditures. These considerations lend themselves more to a "price for service" determination than a "contribution to capital."

Section 1032 of the Internal Revenue Code of 1954 is sometimes raised by taxpayers in situations similar to that here involved. It provides:

(a) NONRECOGNITION OF GAIN OR LOSS.—No gain or loss shall be recognized to a corporation on the receipt of money * * * in exchange for stock * * * of such corporation.

Since stock was issued to the members of the Tower Club, it could be argued that this section is applicable to the situation here, at least in form. The petitioners, however, have not taken the position that the entire contribution was in exchange for stock and the respondent has

disallowed as a contribution to capital only that portion in excess of par value. We feel that what we have said above pertaining to the "contribution to capital" theory is appropriate and dispositive of this point as well. In substance, the initiation fee was more indicative of a payment for services than a payment for stock. See *Affiliated Government Employees' Distributing Co.*, 37 T.C. 909 (1962). But compare *Federal Employees Distributing Co.* v. *United States*, 206 F. Supp. 330 (1962).

The apparent intent of the members was to obtain the use of the facilities and services of the Tower Club. Only those who paid the whole initiation fee were entitled to such privileges. A realistic appraisal of all the facts stipulated in this case does not warrant treating the initiation fees as contributions to capital. Accordingly, we hold that the respondent correctly determined that the amounts paid by the members, over and above the par value of the stock, constituted taxable income.

*Decision will be entered for the respondent.*