actions. We note that the application to the Discharge Review Board which resulted in the change of the nature of the discharge was not filed within the 15-year limitation set forth in its enabling statute, but since neither party has made anything of this, we do not consider it as a factor. However, defendant does point out that the Discharge Review Board has been granted no other authority by its statute than to change the *character* of the discharge (§ 1553(b)), and so would have acted *ultra vires* had it altered the date.

Defendant's motion to dismiss is therefore granted and plaintiff's motion for summary judgment is denied. The petition is dismissed.

**Ethel ECKSTEIN**

v.

**The UNITED STATES.**

**No. 83–66.**

United States Court of Claims.

Dec. 10, 1971.

Mortimer B. Wolf, New York City, attorney of record, for plaintiff. Meyer William Ross and Maloney, Ross, Phelps & Wolf, New York City, of counsel.

David Sher, New York City, attorney for Cooperative Housing Lawyers Group, amicus curiae. Robert D. Steefel, New York City, of counsel.

Joseph Kovner, Washington, D. C., with whom was Acting Asst. Atty. Gen. Fred B. Ugast, for defendant. Philip R. Miller, Washington, D. C., of counsel.

Before LARAMORE, Acting Chief Judge, and DURFEE, DAVIS, COLLINS and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on May 17, 1971. Exceptions to the commissioner's report were filed by plaintiff and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court is in agreement with the opinion, findings and recommendation of the trial commissioner, with minor modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case as hereinafter set forth. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

Commissioner Gamer's opinion, with minor modifications by the court, is as follows:

Plaintiff sues to recover alleged overpayments on her individual income taxes for the years 1959 and 1960.

During such years plaintiff was an apartment tenant stockholder in a New York corporation (the 120 East 81st Street Corporation) which she contends was a "cooperative housing corporation" as defined in Section 216(b) of the Internal Revenue Code of 1954 (26 U.S.C. § 216 (1964)). As such a stockholder, plaintiff would enjoy certain tax advantages, i. e., in the computation of her in-

dividual income tax, she would be allowed as a deduction amounts paid to the cooperative to the extent that such amounts represented her proportionate share (based on the total shares outstanding) of the real estate taxes and mortgage interest allowable as a deduction to the cooperative.

Under Section 216(b) (1) (D), however, a corporation can gain status as a "cooperative housing corporation" only if at least 80 percent of its gross income (for the taxable year for which the tenant-stockholder claims the real estate and interest deductions) is derived from tenant-stockholders.[1] Since the Commissioner of Internal Revenue determined that, for the years in question, the cooperative in which plaintiff was a tenant-stockholder did not so qualify, the deductions which plaintiff took for her pro rata portion of the mortgage interest and real estate taxes paid by the cooper-

ative during such years were disallowed. Plaintiff here sues to recover the increased taxes she was obliged to pay as a result of such disallowances.[2]

In determining that 80 percent of the cooperative's gross income was not derived from its tenant-stockholders, the Commissioner treated three items in a manner which plaintiff contests. Had these items been treated as plaintiff contends they should have been, the cooperative would have met the 80-percent requirement. The three items are as follows:

1. Each tenant was required to sign a "proprietary lease." This lease entitled the tenant to live in a specified apartment. In addition, the lease set forth, in certain respects, the manner in which the cooperative would be operated and the rent for the apartment would be determined. The annual rent (commonly referred to as "assessments" on the

---

1. "Sec. 216. Deduction of Taxes, Interest, and Business Depreciation by Cooperative Housing Corporation Tenant-Stockholder.

"(a) *Allowance of deduction.*

"In the case of a tenant-stockholder (as defined in subsection (b) (2)), there shall be allowed as a deduction amounts (not otherwise deductible) paid or accrued to a cooperative housing corporation within the taxable year, but only to the extent that such amounts represent the tenant-stockholder's proportionate share of—

"(1) the real estate taxes allowable as a deduction to the corporation * * * on the * * * apartment building and on the land on which such * * * building * * * [is] situated, or

"(2) the interest allowable as a deduction to the corporation * * * paid or incurred by the corporation on its indebtedness contracted—

"(A) in the acquisition * * * of the * * * apartment building, or

"(B) in the acquisition of the land on which the * * * building * * * [is] situated.

"(b) *Definitions.*

"For purposes of this section—

"(1) *Cooperative housing corporation.*

"The term 'cooperative housing corporation' means a corporation—
"* * * *

"(B) each of the stockholders of of which is entitled, solely by reason of his ownership of stock in the corporation, to occupy for dwelling purposes * * * an apartment in a building, owned or leased by such corporation,

"(C) no stockholder of which is entitled * * * to receive any distribution not out of earnings and profits of the corporation except on a complete or partial liquidation of the corporation, and

"(D) 80 percent or more of the gross income of which for the taxable year in which the taxes and interest described in subsection (a) are paid or incurred is derived from tenant-stockholders.

"(2) *Tenant-stockholder.*

"The term 'tenant-stockholder' means an individual who is a stockholder in a cooperative housing corporation * *.

"(3) The term 'tenant-stockholder's proportionate share' means that proportion. which the stock of the cooperative housing corporation owned by the tenant-stockholder is of the total outstanding stock of the corporation * * *."

2. Refund claims have been filed by 65 of the tenant-stockholders of the cooperative who have similarly paid deficiency assessments for 1959 and 1960. The Internal Revenue Service is withholding action on said claims pending the determination of this case.

tenant-stockholders) was to be calculated as the tenant's proportionate share of the aggregate amount of the cooperative's "cash requirements" for the year, including mortgage interest and amortization payments. The lease then provided:

> Any sums which the Lessee may pay hereunder which are allocated, used or to be used to meet cash requirements of the Lessor for mortgage amortization payments, or any other mortgage principal payments or for capital improvements or any other capital expenditure, shall not be deemed income to the Lessor but shall be credited by the Lessor upon its books as "Paid in Surplus."

The 1959 and 1960 rental payments made by the tenant-stockholders totaled $400,000.08 for each year. In 1959, the cooperative paid $93,588.33 for reduction of the principal on its mortgage, and $97,871.41 for such purpose in 1960. The cooperative also credited equivalent amounts for such years to its "Paid-in Surplus" account and excluded such sums from its income accounts. Its corporate income tax returns similarly excluded these sums from gross income. The Commissioner did not object to these exclusions and there was and is no controversy between the cooperative and defendant with respect to these returns.[3]

In making his determination that during both 1959 and 1960, the cooperative did not meet the requirements of Section 216(b) that 80 percent or more of its gross income be derived from tenant-stockholders, the Commissioner similarly excluded from the cooperative's gross income from tenant-stockholders sums equal to the mortgage amortization payments made by the cooperative, these amounts being the same as the cooperative had credited on its books as "Paid-in Surplus."

Plaintiff challenges this exclusion by the Commissioner. She contends that the full amount received by the cooperative each year from its tenant-stockholders should be treated as income. Such treatment would, of course, result in a higher figure for the "gross income * * * derived from tenant-stockholders" referred to in Section 216(b) (1) (D), and thus help it to meet the 80-percent requirement.

2. In 1957, a New York corporation, the 1186 Lex Corporation, was in the process of constructing the apartment building here involved. The president and one-third stockholder of this corporation was Mr. Nourollah Elghanayan.[4]

The cooperative was organized on June 13, 1957, by the Lex Corporation for the specific purpose of having the cooperative purchase the land and apartment house being constructed thereon (the Lex Corporation sometimes being referred to by the parties as the "sponsor" of the housing project), and on July 1, 1957, by a Plan of Organization and a Seller's Agreement, the cooperative, subject to various terms and conditions, agreed to purchase the land and completed building for $4,875,000. The cooperative had an authorized capital stock of 40,000 shares, all of which were allocated to the apartments in the building.

The Plan provided that, upon its consummation (i. e., at the time of the closing, which was to take place promptly after the completion of the building), all of the 40,000 shares would be fully paid for by stockholders who would lease the apartments. The sale of all of such stock (by the leasing of the apartments) would permit the cooperative, at such closing time, to take over the property with no debts or obligations except for a permanent mortgage in the principal amount of $2,600,000. Thus, the leasing

---

3. The cooperative's returns for both years showed operating losses and no income tax due. Had the amounts paid for amortization of mortgage principal during those years not been excluded from the cooperative's gross receipts (and total income),

it would have had a taxable income of $61,726.26 for 1959, but for 1960 a loss would still have been incurred.

4. All of the other stockholders were his relatives.

of all of the apartments and the sale of the stock allocated to such leases were prerequisites to the enabling of the cooperative to take over the property at the purchase price, the proceeds of the sale of all the stock producing the difference between the purchase price and the amount of the permanent mortgage. As assurance to the cooperative-purchaser that, at the time of the closing, all of such stock would be sold, the Plan provided that if, at such time, all of the stock had not been sold (to proprietary lessees), the Lex Corporation would provide "individual purchasers for such unsold stock and they will enter into proprietary leases for the apartments to which such shares are allocated * * *." [5] The Seller's Agreement similarly provided.[6]

At the closing date of September 22, 1958, 21 apartments remained unleased, and the Lex Corporation provided Elghanayan as the purchaser of the shares allocated to such apartments. As such purchaser, he executed 21 separate leases for the apartments, and the shares allocated thereto were all registered in his name. The value of such shares was credited against the purchase price paid by the cooperative for the building.[7]

For the years 1959 and 1960, the Commissioner excluded from the gross rentals which the cooperative received from its tenant-stockholders the rental amounts with respect to the apartments carried in the name of Elghanayan—$15,962.64 for 1959, and $3,200.04 for 1960.[8] The Commissioner did not feel that such payments could properly be considered as rental income from bona fide "tenant-stockholders." Such figures were instead added to the cooperative's other income. These reductions in the "gross income derived from tenant-stockholders" figures and additions to the cooperative's "other income" figures for such years further contributed to the imbalance between them and the prevention of the former figures reaching 80 percent of the cooperative's gross income. Plaintiff, of course, contends that the Commissioner erred in not considering such rental payments from Elghanayan to be properly includable as rental income from "tenant-stockholders."

For many years after the enactment of Section 23(z) of the Internal Revenue Code of 1939,[9] which was the forerunner of Section 216 of the 1954 Code, many persons associated with cooperative housing projects in New York State adopted the practice under which the sponsor corporation was required to provide individuals to execute, as lessees,

---

5. It was further provided that "[a]ny such stock and leases so acquired by purchasers provided by the Seller may be sold or assigned or such apartments may be sublet * * *."

6. "At the time of closing, any stock not theretofore sold will be purchased by individual purchasers to be provided by the Seller and such stock and proprietary leases accompanying the same will be executed and delivered to such purchasers, who will at such time pay the purchase price therefor."

7. Plaintiff's apartment was one of those which had not been leased as of the closing date. Plaintiff received an assignment of the lease for her apartment from Elghanayan, and on December 29, 1958, she purchased from him the 285 shares allocated thereto.

   When the Lex Corporation originally organized the cooperative, it appointed all seven members of the cooperative's board of directors. Even after the closing, the cooperative's board contained two members appointed by Elghanayan, in accordance with a provision in the Plan that, as long as the individual purchasers provided by the Lex Corporation continued to own 2,000 or more shares, they would have the right to designate two of the seven directors.

8. Between September 22 and December 31, 1958, Elghanayan executed assignments of leases and transfers of the allocated shares with respect to seven apartments. In 1959, he executed such assignments and share transfers with respect to 13 additional apartments. Thus, on January 1, 1959, 14 apartments were in his name and on January 1, 1960, only one apartment so remained.

9. Added by the Rev. Act of 1942, c. 619, Sec. 128, 56 Stat. 798.

proprietary leases on all apartments unsold as of the date of closing title and to purchase the shares allocated to such apartments, with the sponsor guaranteeing that such persons would pay the required rentals. Such individuals were referred to as being "nominated" by the sponsor to carry out such obligations of purchasing the shares, executing the leases and paying the rentals until the stock was resold as an incident of a transfer of the lease. It was pursuant to such practice and the aforementioned provisions of the Plan and Seller's Agreement that Elghanayan was "nominated" as the purchaser of the unsold shares. In disallowing the Elghanayan rental payments as receipts from "tenant-stockholders," the Internal Revenue Service referred to him as the "Nominee of 1186 Lex Corporation," and the parties here frequently refer to this issue as "the Elghanayan 'Nominee' Issue."

3. The apartment building also contained some commercial space, consisting of a garage and stores. The agreement between the Lex Corporation and the cooperative for the sale of the property provided that, at the time of closing title, the Lex Corporation would deliver to the cooperative leases, of at least three years' duration, of such commercial space which would "provide for an average aggregate rental of not less than $80,000 per annum over the three year period or a total of not less than $240,000 over said three year period." The agreement further provided that, if such leases were not provided at the time of closing, the Lex Corporation would, for three years thereafter, pay to the cooperative "the difference between the average annual rentals provided in such leases and $80,000 * * *." [10]

During each of the years 1959 and 1960, the commercial income failed to reach the $80,000 guaranteed amount. In 1959, the Lex Corporation paid the cooperative $14,675 to fulfill its guarantee obligation, and in 1960 similarly paid $2,587.50. The cooperative treated such payments as commercial rental income, the amounts being described in its accounts as "Minimum average rental guarantee of Sellers."

In calculating the income from sources other than tenant-stockholders, the Commissioner similarly included these amounts as commercial rental income. However, as with the mortgage amortization issue, plaintiff says that both the cooperative and the Commissioner erred. She argues that such amounts should not properly be regarded as "rent" since the Lex Corporation was not a lessee of any commercial space. It was, she maintains, only the seller of real property and, as such, the payments made by it under its guarantee should be regarded as an adjustment of the selling price. Accordingly, she argues that such amounts should not be regarded as any kind of "income" at all to the cooperative. The removal thereof from the amounts received by the cooperative as income from sources other than tenant-stockholders, with the consequent lowering of such figure, would make it easier for the amount of income received from tenant-stockholders to meet the 80-percent requirement.

### The Mortgage Amortization Issue

Plaintiff argues that the full amount of the moneys received by the cooperative from the tenant-stockholders out to be treated as "income" to the cooperative because, regardless of the ultimate application of any part of such moneys, they are all first "received" by the cooperative, and thereby necessarily become part of its "gross receipts." Plaintiff adduced expert accounting testimony to the effect that under generally accepted accounting principles, all receipts by a corporation should be entered into its "gross receipts" account despite the fact

---

10. It was further provided that, if the Lex Corporation made any such differential payment in any year but in a subsequent year of the three-year period the aggregate of such rentals exceeded $80,000, the cooperative would repay the excess, but not in an amount greater than had previously been paid by the Lex Corporation.

that one of the debts to be paid therefrom is mortgage principal.

Although such accounting principles might well be applicable as a general proposition, the particular situation and facts must control.[11] The fact is that in this instance plaintiff's general proposition would directly contravene the terms of her proprietary lease. In that instrument, she specifically agreed, as a lessee-stockholder, that such portions of her rental payments "allocated" or "used" to meet the mortgage amortization requirements of the lessor-cooperative "shall not be deemed income to the lessor" and, instead, "shall be credited by the lessor upon its books as 'Paid in Surplus.'"

■ Considering the purpose of this lease provision and of the cooperative itself, no impropriety is shown in the manner in which the amortization payments were treated. Defendant is making no attempt to upset the provision as a tax avoidance scheme or otherwise. Even in the case of an ordinary corporation, there is no reason why it and one of its stockholders cannot validly agree that a payment or a part of a payment made by the stockholder to the corporation should be used only for the specific, designated purpose of a capital contribution, and therefore not be treated as general income funds of the corporation. Paducah & Illinois R.R., 2 B.T.A. 1001 (1925). Whether payments are excludable from ordinary income as contributions to capital depends, as shown by the facts of the individual case, upon the intent of the parties and "[t]he substance of the whole transaction * * *." James Hotel Co., 39 T.C. 135, 141 (1962).

The cooperative itself strictly abided by its lease agreement. It did not regard such amounts as "income" and credited them on its books as additional paid-in capital. It did not report the amounts as "income" on its income tax returns and the Commissioner did not object—despite the fact that for 1959 the inclusion of such amount as corporate income would result in the corporation's showing a taxable profit rather than a loss.

Under the doctrine of Commissioner of Internal Revenue v. Danielson, 378 F.2d 771 (3rd Cir.), cert denied, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967), the Internal Revenue Service has the right to accept at face value, if it wishes, the parties' contractual provisions with respect to characterization of items, unless the taxpayer attacking the contractual provision (for tax purposes) shows that it is unenforceable between the parties because of mistake, undue influence, fraud, duress, etc. No such proof has been made here and there is no reason to disavow the plaintiff's specific agreement in her proprietary lease as to the characterization of the amortization allocations.

Moreover, the existing law supports the contractual characterization. In 874 Park Avenue Corp., 23 B.T.A. 400 (1931), the facts were substantially similar. There, however, it was the Commissioner who attempted to have the portion of the tenant-stockholders' assessments used for the amortization of the housing cooperative's mortgage indebtedness included in the cooperative's taxable gross income on the same grounds that plaintiff asserts here, i. e., that such portion should be treated as part of the total rent received from the tenants for the operation of the building. The Board of Tax Appeals rejected the attempt. The proprietary leases there involved contained a provision that "so much of such [rent] assessments collected by the Lessor as shall be devoted to the payment of the principal of a mortgage or mortgages or to other capital expenditure shall be credited by the Lessor upon its books to the account of

---

11. "While testimony relative to accepted accounting practice may properly be considered by the court, it is not conclusive in determining the legal tax consequences of any transaction." United Grocers, Ltd. v. United States, 308 F.2d 634, 641 (9th Cir. 1962).

'paid-in surplus.'" (at 407) The cooperative did in fact so use such payments for mortgage amortization purposes, did not include such amounts in its income statements, and added them to its capital account. Although such lease language is less explicit than that here involved because it does not contain the specific provision that such portion of the rental payments "shall not be deemed income to the Lessor," the Board nevertheless held that "the assessments so made and employed were contributions of capital to the [cooperative] and as such nontaxable." (at 405) The Board analogized the situation to its previous holding in *Paducah & Illinois R.R., supra,* where two railroads organized a third corporation to provide bridge facilities. A contract between the railroads and the bridge company provided that the railroads, as the sole stockholders, would pay the expenses of the bridge company and would make contributions to a sinking fund for the retirement of the company's bonds. The payments made by the railroads were earmarked partly for the bridge company's ordinary expenses and partly for the capital contributions. The Board held that insofar as the payments were to be used (and were actually used) for the bridge company's ordinary expenses, the railroads were paying for services rendered, which payments constituted expenses to themselves and income to the bridge company, but to the extent that the contract required the payments to be used for debt retirement, they constituted capital contributions.

In Cambridge Apartment Building Corp., 44 B.T.A. 617 (1941), where the Commissioner assessed deficiencies against a housing corporation on the theory that the part of the assessments collected from the tenant-stockholders for the purpose of retiring bonded indebtedness constituted income to the corporation, the Board, relying on the *Paducah* and *874 Park Avenue* cases, again held that such amounts paid by the tenant-stockholders did not constitute income to the corporation. And in Lake Forest, Inc., 22 TCM 156 (1963), which involved the question of whether a housing cooperative could both exclude from income mortgage amortization payments made by its tenant-stockholders and take depreciation deductions, the court again reaffirmed *874 Park Avenue Corp., Cambridge Apartment Building Corp.,* and *Paducah & Illinois R.R.* In rejecting the Government's argument that, since the tenant-stockholders were only tenants and not the owners of the building, all payments made by them should be treated as rent for the use of the cooperative-landlord's property and be included in taxable gross income of the corporation, the court stated:

It seems clear that if petitioner's members had contributed the entire purchase price at the time petitioner bought the property * * * then petitioner could both exclude the contributions from income and deduct depreciation on the depreciable property purchased with such contributions. We fail to see a significant difference where petitioner's members made their capital contributions in installments instead of all at once. *Id.* at 163–64.

The holdings in *874 Park Avenue Corp., Cambridge Apartment Building Corp.,* and *Lake Forest, Inc.,* in effect affirmed a ruling of the Bureau of Internal Revenue, promulgated as long ago as 1922, the amounts paid by tenant-stockholders under proprietary leases which were to be used for mortgage amortization and credited to paid-in surplus were contributions to capital and did not constitute income to the corporation. The ruling stated

* * * that that portion of the assessment payments credited to the "paid-in surplus" account and devoted to the reduction of the corporation's mortgage indebtedness or for other capital purposes is in the nature of a voluntary assessment upon the stock held by the individual proprietary lessees, which * * * represents additional cost of such stock, and does not constitute income to the corporation.

I.T. 1469, I–2 Cum.Bull. 191, 192 (1922).

Section 118(a) of the 1954 Code (26 U.S.C. § 118(a) (1964)) specifically provides that "[i]n the case of a corporation, gross income does not include any contribution to the capital of the taxpayer."

Plaintiff points to the provision in her lease which includes "mortgage amortization payments" in the various "expenses" of the cooperative which may be included in its "cash requirements" for the purpose of the annual computations to be made by the cooperative's board of directors of the amounts to be paid by the tenant-stockholders as rent. Therefore, says plaintiff, the full amount of such "rent" must necessarily be considered as gross receipts of, and income to, the cooperative, even though a portion of it is used for mortgage principal payments.

This contention fails to give consideration to the later explicit provision in the lease that the portion of the rental payments allocated or used to meet the mortgage amortization requirements is to receive special treatment. In *874 Park Avenue Corp.* the same contention was made, *i. e.*, that because the mortgage amortization contributions were referred to as "rent" in one part of the lease, "they were in fact payments of rent." 23 B.T.A. at 407. However, the Board held that "this contention is completely refuted, it seems to us, when the lease is read as a whole and the purpose of the individual corporators of [the cooperative] in creating the corporation are taken into account." *Id.*

The fact that the cooperative kept the tenant-stockholders' payments in a single bank account from which both the general expenses and mortgage indebtedness were paid is of no significance. *874 Park Avenue Corp., id.* at 405. It is the "substance of the whole transaction" (James Hotel Co., 39 T.C. at 141) that is determinative, not the bank account mechanics the cooperative employed.

The income from the commercial space went into the same general bank account. Due to such commingling of funds and the consequent impossibility of tracing specific dollars, plaintiff urges that at the least the amortization payments made from such account should be deemed to have been composed of both the rent from the tenant-stockholders and from the commercial space, the amount from each calculated on a basis proportionate to their contributions to the total in the account. Plaintiff says there was nothing to prevent the use of the commercial income for any of the cooperative's needs, including principal payments on the mortgage. Thus, even if the portion of the rents from the tenant-stockholders used to make the amortization payments is excluded from the cooperative's gross income, the contribution to such payments from the commercial income would result in a lesser amount being contributed by the tenant-stockholders and excluded from such income.

This argument too lacks merit. The inability to trace specific dollars as between the commercial space rental income and the tenant-stockholders' rental payments, is unimportant, as is the fact that the board of directors of the cooperative did not provide for an actual segregation of the commercial receipts from the tenant-stockholders' assessments. On the facts there can be no question that, for the years here involved, the cooperative intended that only the tenant-stockholders' rental payments would constitute the source of the mortgage principal installments due, and that it therefore must be deemed to have "used" or "allocated" such portion of their rents as was necessary to completely liquidate such installment indebtednesses.

Just prior to the September 22, 1958 closing of title, the stockholders and directors, at a special meeting held on September 4, 1958, adopted a resolution that the amount to be paid by the cooperative "and needed to make payments on account of or for amortization of the principal of the mortgage indebtedness * * * is to be deemed a contribution

of capital and shall be added to the paid-in surplus of the Corporation * * *." It would be most unusual, indeed, for the commercial tenants to make a "contribution" to the capital of the corporation. They would have no interest in so contributing. It is normally the stockholders who make "contributions" to the capital of a corporation, for they would be the ones to benefit thereby. Unlike the tenant-stockholders' proprietary leases, the commercial leases made no mention of mortgage amortization. In view of the "contribution of capital" language in the resolution, the only rational conclusion is that, for the years in question, the directors and stockholders considered these capital contributions as coming only from the tenant-stockholders. The cooperative's accounting statements for these years leave no room for doubt concerning this point. The statement for 1959 attributed the full amount of the mortgage principal installments paid in such year ($93,588.33) as having been "appropriated" from the "[a]ssessments on tenant-stockholders."[12] And the statement for 1960 similarly attributed the full amount of the mortgage amortization payments made during such year ($97,871.41) to the "[p]ortion of assessments allocated" for such purpose.[13] The balance sheets included in such statements show the identical full amounts which had been "appropriated" and "allocated" for the amortization payments as "Additional paid-in capital" under the caption "Stockholders' equity."

As further proof that the tenant-stockholders' assessments constituted the sole source of the mortgage amortization payments during such years is the fact that subsequent thereto, the board of directors, on August 30, 1961, adopted a resolution specifically providing that the portion of the assessments which would be allocated to the payment of mortgage principal during any period, would be the percentage which the total of the assessments bore to the total income of the cooperative for such period. This is the alternative formula which plaintiff urges should be adopted for the two years here involved. Plainly, however, the adoption of the resolution marked a

---

12. The cooperative's first accountant's report, which was for the period September 22, 1958, the date operations commenced, to December 31, 1958, set forth the portion of the assessments on tenant-stockholders which was appropriated for the reduction of mortgage principal in the identical manner. This report was approved at a stockholders meeting held on March 16, 1959. The second accountant's report, covering the interim period January 1 to June 30, 1959, was also identical in this respect. This report was approved at a directors meeting held on July 16, 1959.

13. For the year 1959, the accountants set forth the "Income" from the assessments on the tenant-stockholders as $306,411.75, being the net of the total $400,000.08 assessment figure less the $93,588.33 "portion appropriated for the reduction of the mortgage principal." The two previous accountants' reports (note 12) similarly set forth the assessments under "Income" in only a net amount. For 1960, however, the accountants, for the first time, showed the entire $400,000.08 assessment figure under "Income," without any reduction. The "Portion of the assessments on tenant-stockholders allocated for mortgage amortization payments" was, instead, set forth at a later point in the statement under the heading "Financial expenditures." (In this report, the accountants, in setting forth the 1959 figures for "comparative" purposes, restated such figures to conform to the 1960 setup.) The reason for this sudden change in the statements is not clear. Each report carried the usual certification that it was "in conformity with generally accepted accounting principles." However, by January 31, 1961, the date of the accountants' 1960 statement, the issue involved in this case had already arisen. Sometime in 1960, the deductions of a director tenant-stockholder's proportionate share of real estate taxes and mortgage interest paid in 1958 by the cooperative was disallowed by a Revenue Agent on the ground that less than 80 percent of the cooperative's gross income during that year had been derived from tenant-stockholders. At the same time, the Revenue Agent similarly so concluded with respect to 1959.

change in the cooperative's policy. Such adoption followed a special meeting of the board held on August 8, 1961, attended also by the accountants, at which the question of the propriety of such a formula was considered.[14]

Plaintiff's final argument is based upon the stipulated fact that during the two years here involved, the assessments paid by plaintiff "were not more than rental charges then obtaining for equivalent apartment space in non-cooperative rental buildings in that area of New York City." The contention is that the full value of services rendered by the corporation, including those rendered to its stockholders, must be deemed to constitute income, otherwise what plaintiff terms a "bargain purchase" situation results, causing an improper understatement of the cooperative's income. If the "income" the cooperative derives from the tenant-stockholders is less than the fair rental value of their apartments, then, plaintiff argues, a distribution of income to the stockholders would, in effect, result. The difference between such lower amount and the actual fair market value therefore must, says plaintiff, constitute imputed income to the cooperative. By this reasoning, only amounts paid by the stockholders in excess of the fair market rental value of their apartments could be considered as contributions to capital. And plaintiff further points out that, while Section 1.118–1 of the Treasury Regulations on Income Tax (1954 Code) repeats the Code provision that contributions to the capital of a corporation are to be excluded from income, it specifically provides further that "the exclusion does not apply to any money or property transferred to the corporation in consideration for goods or services rendered * * *."[15] The entire amount of the

14. At the meeting on August 30, 1961, the board also adopted a resolution which applied the new formula retroactively to the tenant-stockholders' assessments received since September 22, 1958, the date upon which the cooperative took title, and the accountants the following day issued a new report for 1960 applying the new formula and reducing the additional paid-in capital from $97,871.41 to $82,270.71. Manifestly, while the new formula might well be appropriate on a prospective basis, it could hardly, on a retroactive basis, serve to undo that which had already been done. Plaintiff herself agrees that no weight should be given to the board's action in 1961 or to the accountants' statements following such action insofar as they were "designed to remedy retroactively for the record the [prior] situation * * *." (Pl. Objections to Def. Requested Additional Findings, p. 12) This new report stated that it "was made in accordance with generally accepted auditing standards," and that it "fairly" presented the cooperative's "financial position" and "the results of its operations" for 1960 "after giving retroactive effect to certain actions of the Board of Directors in August 1961."

15. The section is as follows:
"§ 1.118–1 *Contributions to the capital of a corporation.*
"In the case of a corporation, section 118 provides an exclusion from gross income with respect to any contribution of money or property to the capital of the taxpayer. Thus, if a corporation requires additional funds for conducting its business and obtains such funds through voluntary pro rata payments by its shareholders, the amounts so received being credited to its surplus account or to a special account, such amounts do not constitute income, although there is no increase in the outstanding shares of stock of the corporation. In such a case the payments are in the nature of assessments upon, and represent an additional price paid for, the shares of stock held by the individual shareholders, and will be treated as an addition to and as a part of the operating capital of the company. Section 118 also applies to contributions to capital made by persons other than shareholders. For example, the exclusion applies to the value of land or other property contributed to a corporation by a governmental unit or by a civic group for the purpose of inducing the corporation to locate its business in a particular community, or for the purpose of enabling the corporation to expand its operating facilities. However, the exclusion does not apply to any money or property transferred to the corporation in consideration for goods or services rendered, or to subsidies paid for the purpose of inducing the taxpayer to limit production. See

rent, plaintiff urges, must here be regarded as being paid "in consideration for goods or services rendered" because under the proprietary lease possession of the premises was conditioned upon the paying of such rent. Thus, "[t]he entire rent was paid for services and the entire rent was necessarily income to the Corporation," [16] and this must be so, plaintiff argues, regardless of any labels that may have been applied to any portion of such rent.[17]

Even though one of the purposes of a cooperative may be to furnish products or services to members at prices below those which nonmembers must pay for comparable products or services, no reason is apparent why even a cooperative could not run into the tax problems which are incident to the furnishing of products or services at prices below the cost of furnishing them or below "fair market value," resulting in a distribution of income to the members and a depressing of the cooperative's taxable income. See Anaheim Union Water Co. v. Commissioner, 321 F.2d 253 (9th Cir. 1963). If they realize profits, cooperative corporations too must pay the regular corporation income taxes.

However, even if the "rent" of the tenant-stockholders is deemed not to include the portion allocated to mortgage amortization, so that, on a monthly basis, they are paying less than renters of

comparable space in noncooperative buildings in the same area, it does not necessarily follow that on an overall basis they are the recipients of any "bargain purchase." This is so because such a calculation gives no consideration to the fact that the tenant-stockholders were obliged to make a substantial purchase of stock for the privilege of living in the building, an investment which the tenants in the commercial apartment building were not obliged to make. Plaintiff paid $15,750 for the shares allocated to her apartment.[18] There is here no showing that the amount of the "rent" plaintiff paid, even if calculated at the reduced figure resulting from the elimination therefrom of the allocable mortgage amortization, but adding thereto the costs flowing from her stock purchase, did not equal "fair market value."

Plaintiff's contention thus necessarily falls because comparing her situation with renters of similar space in commercial buildings is improper. The correct comparison is, instead, with the homeowner. As the legislative history shows, the very purpose of Section 216 and its predecessor Section 23(z) of the 1939 Code is to give tenant-stockholders of housing cooperatives the same tax deductions as are allowed to homeowners. S.Rep.No.1631, 77th Cong., 2d Sess. (1942-2 Cum.Bull. 504, 546).[19] The al-

---

section 362 for the basis of property acquired by a corporation through a contribution to its capital by its stockholders or by nonstockholders." 26 CFR 1.118-1.

16. Pl. Brief On Requested Findings, p. 6.

17. In support, plaintiff cites 1 Mertens, Law of Federal Income Taxation, § 5.09 (rev. 1969), which states: "Neither names nor labels are determinative * * *; * * * a transfer of funds from surplus to capital stock account will not change them from 'earnings and profits' to capital; * * *. A receipt is income, if its inherent characteristics show it to be such, regardless of the name it bears."

18. Upon its organization, the cooperative allocated its 40,000 shares to the 101

apartments in the building, the selling price to the tenant-stockholders being $59 per share. There were 285 shares allocated to plaintiff's apartment. The tenants executed stock purchase agreements for the stock allocated to the apartments they wished to rent. Thus, to occupy plaintiff's apartment, a stock purchase in the amount of $16,815 would be required. Plaintiff's apartment was one of those which remained vacant as of the date of closing. It was, therefore, taken over by Elghanayan as "nominee." On December 29, 1958, plaintiff purchased the 285 shares from Elghanayan for $15,750.

19. "The bill provides for a new deduction in section 23(z) of taxes and interest paid or accrued by a tenant stockholder to a cooperative apartment corporation within the taxable year. The provision applies

lowance to tenant-stockholders of qualified housing cooperatives of deductions similar to those of homeowners, *i. e.*, amounts equal to their proportionate share of mortgage interest and real estate taxes paid by the cooperative, is accomplished by in effect disregarding the corporate entity in this respect and "passing through" these deductions to the tenant-stockholders, as if they were the "owners." [20]

Accordingly, in analogizing plaintiff's situation, as the law does, to a homeowner, who also is normally required to make a substantial initial capital investment, considerations of "bargain purchase"—in the sense that plaintiff here uses the term of comparing amounts of monthly "rental" payments with those of commercial apartment occupants—become inapplicable. On plaintiff's theory, when the time arrives that the mortgage will be liquidated and the "cash requirements" of the cooperative will therefore be reduced, the cooperative would nevertheless be obliged to continue to charge its tenant-stockholders "rent" equal to the "fair market value" of equivalent space in commercial buildings, or to credit itself, as "imputed income," with the difference between the reduced "rent" charged its tenant-stockholders, and such "fair market value." However, on the correct analogy to that of the homeowner, whose periodic payments of mortgage principal increase his equity in his property, the equity of a tenant-stockholder in a cooperative housing corporation is similarly regarded as being increased when the cooperative's mortgage principal payments are made, which is clearly the rationale for the lease provision that such portion of the "rent" which is "allocated" or "used" for mortgage amortization purposes is to be considered as a capital payment, to be credited to "paid-in surplus," and not to "income." The homeowner too, after liquidating his mortgage, may be able, on a current monthly outlay basis, to live on his property less expensively than his neighbor who is renting similar premises—provided again that no consideration is given to his capital investment (and loss of interest thereon over the years).

Because of the special nature of the relationship between a cooperative housing corporation and its tenant-stockholders insofar as the tax statutes are concerned, the court in *Lake Forest, Inc.* did not feel that the decisions in cases of other types of membership cooperatives or corporations [21] involving the question of "whether certain payments by stockholders were contributions to capital or payments for services rendered or to be rendered * * * require a different decision in this case." 22 TCM at 164.

█ Based upon the above considerations, the refusal of the Commissioner to change the "income" figure on the cooperative's 1959 and 1960 returns by add-

---

only to a cooperative apartment corporation which has one class of stock outstanding and all of the stockholders by reason of their ownership of stock are entitled to occupy for dwelling purposes apartments in a building owned or leased by the corporation. Eighty per cent or more of the gross income of the cooperative apartment corporation for the taxable year must be derived from the tenant stockholders, and the tenant stockholders who occupy the building must not be entitled to receive any distribution of the earnings or profits of the corporation except upon its complete or partial liquidation. *The general purpose of this provision is to place the tenant stockholders of a cooperative apartment in the same position as the owner of a dwelling house so far as deductions for interest and taxes are concerned.*" (Emphasis supplied.)

20. A person who owns his own home can deduct on his federal income tax return the amount of his property taxes and his mortgage interest. Int.Rev.Code of 1954, §§ 163, 164. On the other hand, a person who rents a house or apartment can take no tax deduction for any part of his rental payment, since this is a "personal, living, or family expense." *Id.*, § 262.

21. Including United Grocers, Ltd. v. United States, *supra* note 11, upon which plaintiff relies.

ing thereto the amounts of the mortgage amortization payments, and considering such additions as "income" from tenant-stockholders for application of the 80-percent rule, was proper.

### The Elghanayan Nominee Issue

Plaintiff's case for overturning the Commissioner's determination on this issue is insufficient.

Section 216(b) of the Code defines a "cooperative housing corporation" as one in which "each of the stockholders * * * is entitled, solely by reason of his ownership of stock in the corporation, to occupy *for dwelling purposes* * * * an apartment in a building, owned * * * by such corporation * * *." (Emphasis supplied.) As noted, Section 216 first appeared as Section 23(z) of the 1939 Code. It has remained substantially unchanged since its enactment. Section 23(z) was added by a Senate amendment to the House bill (H.R. 7378, being the Revenue Act of 1942). The aforementioned Senate report on such bill explains, with respect to such section (constituting Section 129 of the Revenue Act):

> The definitions of the terms "cooperative apartment corporation" and "tenant-stockholder" prescribe certain standards which are designed to safeguard the revenue by assuring that the apartment corporations involved are bona fide cooperative apartment corporations *and that the individuals entitled to deductions under section 23(z) are bona fide tenant-stockholders of such corporations.*[22] (Emphasis supplied.)

22. 1942-2 Cum.Bull. 577.

23. "Plainly, this long-continued practice was devised and put into effect in view of the requirement of Section 216(b) (2) that a tenant-stockholder of a Cooperative Housing Corporation be an 'individual.' The 'nominee' procedure satisfied that requirement in that the persons so nominated held the shares and proprietary leases in their individual names, sold and transferred them as individuals, gave in-

The issue is thus whether Elghanayan was a bona fide tenant-stockholder of the housing cooperative who owned stock therein "to occupy for dwelling purposes * * * an apartment" at 120 East 81st Street, New York City. It is plain that Elghanayan was not.

■ The reason is that it is clear that Elghanayan was the nominee, not of an individual, but of a corporation, the selling company, while Section 216(b) (2) requires a tenant-stockholder to be an "individual." His taking over the 21 unsold apartments on the closing date, as the "nominee" of the seller-corporation, the buyer-cooperative not being given any amount for its stock by the individual Elghanayan, but instead being given, by the seller-corporation, credit against the purchase price for the full value of the stock allocated to such apartments, amounted in effect only to a price adjustment between the seller and buyer corporations. As "nominee," Elghanayan was, clearly, only a figurehead for the selling corporation of which he was the president and a major stockholder, a device manifestly adopted, as plaintiff frankly admits, to effect seeming compliance with the requirement of Section 216(b) (2) that a "tenant-stockholder" be *"an individual* who is a stockholder in a cooperative housing corporation * * *."[23] (Emphasis supplied.) It was the seller-corporation that took all deductions in its income tax returns for the proportionate share of the interest and taxes allocable to the 21 unsold apartments, and that reported all gains and losses on the later sales of the stock allocated to the apartments, although such sales were effected by agreements executed by Elghanayan personally.[24]

dividual warranties to the transferee, and, during the time they held the shares and leases, were individually liable for the rents assessed." Pl. Brief On Requested Findings, p. 18.

24. For the 285 shares allocated to plaintiff's apartment, the cooperative received from the seller-corporation a credit on the purchase price of $16,815. (See note 18.) However, plaintiff purchased such shares

The emphasis upon the "nominee" device being a common practice in the New York area is apparently for the purpose of imposing something in the nature of an equitable estoppel against the Commissioner. Plaintiff feels that the Commissioner must have known what was going on over the years and, through his inaction in obtaining a judicial determination of the question, must be deemed to have accepted the practice as satisfying the requirements of Section 216—until he suddenly acted otherwise in this case.[25]

The contention has no merit. Even if the Commissioner had expressly ruled that the "nominee" practice, with respect to nominees of the selling corporation (which is all that is involved here), satisfied Section 216, he could nevertheless reverse himself if he later concluded otherwise, for "[t]he doctrine of equitable estoppel is not a bar to the correction by the Commissioner of a mistake of law." Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 183, 77 S.Ct. 707, 709, 1 L.Ed.2d 746 (1957). In this instance, however, the practice should not reasonably have been based upon a conclusion of Commissioner acceptance or acquiescence because in 1955, well prior to the events here involved, Revenue Ruling 55–316 announced that " * * * individuals who hold * * * proprietary leases as nominees for [the] seller [corporation] do not qualify as tenant-stockholders since the beneficial ownership is in a corporation, which cannot so qualify under section 23(z); * * *." 1955–1 Cum.Bull. 312, 315.[26]

### Moneys Received Under Seller's Commercial Rent Guarantee

■ Plaintiff has made no real showing, by testimony or otherwise, that, for the purpose of the 80-percent rule, the Commissioner erred in classifying these funds as "commercial rental income." As with the mortgage amortization moneys, the Commissioner here too was simply accepting the designation which had been applied to the funds by plaintiff's own cooperative (and its certified public accountants).

Plaintiff's contention is that the seller-corporation was "not a tenant"; that "it received neither space nor services"; that the guarantee moneys were, therefore, "not true income at all" but instead actually amounted to a seller's "adjustment of the purchase price of the building and land" resulting from a breach of the "warranty of minimum receipts from commercial rents," and that such breach made the property "less valuable than had been represented and warranted," with the result that "a portion of the purchase price was returned."[27] This is an ingenious argument, but plaintiff cites nothing in support. The more natural manner of regarding these funds is to consider them as commercial income. They certainly flowed to the cooperative in respect of commercial space. "The fund involved must be considered in the light of the claim from which it was realized

for $15,750. Thus, a $1,065 loss was incurred.

25. The parties have stipulated that "[a]lthough the aforesaid [nominee] practice has been in effect for many years, it is not known to what extent the Internal Revenue Service has had knowledge of, or has approved the practice. Nor has it ever been judicially determined whether the above-mentioned practice is valid under the terms of the Internal Revenue Code."

26. Mertens cites this ruling as the basis for his statement that "[t]o qualify as a

'tenant stockholder' and thus be entitled to a deduction under Section 216 of Code for interest and taxes, a person must satisfy four conditions. First, the person must be an individual, thus excluding a partnership, a corporation, a trust or estate. Secondly, the individual must be the real owner of the stock and not merely a nominee or dummy. * * *" 4A Mertens, Law of Federal Income Taxation, § 26.03c (Rev.1966).

27. Pl. Brief on Requested Findings, pp. 23–24.

\* \* \*." Farmers' & Merchants' Bank of Catlettsburg, Ky. v. Commissioner, 59 F.2d 912, 913 (6th Cir. 1932). (Moneys recovered through compromised litigation represented compensation for lost value of business (capital), not taxable earnings or income.) To the cooperative it made no difference whether such rental income was produced from leases or from the guarantee. *Cf*. Mellinger v. United States, 54–1 USTC ¶ 9197 (S.D.Tex. 1953). (Proceeds received under a policy insuring loss of rents when building was rendered untenantable by fire are to be treated as being in replacement of the lost rentals and therefore properly taxed as ordinary income and not as capital gain resulting from involuntary conversion of property destroyed by fire.)

▇ To carry its burden of overcoming the presumption of correctness attaching to the Commissioner's determination, the taxpayer "must do more than merely claim alternative designations for" the nature of moneys received. Sager Glove Corp. v. Commissioner, 311 F. 2d 210, 211 (7th Cir. 1962). (Commissioner's determination that sum received in settlement of litigation constituted reimbursement for lost profits, taxable as income, and not nontaxable return of capital, sustained.)

## CONCLUSION

Since it is not possible to sustain any of the three bases upon which plaintiff attempts to change the ratio between the gross income which the cooperative received in 1959 and 1960 from its tenant-stockholders and the total gross income it received in such years, the Commissioner's determination that the 80-percent requirement was not satisfied must be upheld.

Plaintiff stresses the alleged unfairness of this result to the tenant-stockholders who in good faith thought that, as apartment residents in a housing cooperative building, they would be entitled to the income tax deductions in question. Their disappointment in this respect is understandable. Nevertheless, Congress imposed the 80-percent requirement as a condition to their receiving such favorable tax treatment. During the initial period of a housing cooperative's existence, it may have difficulty, because of too many unsold apartments, in meeting the requirement. That was obviously the situation in the early years here involved, the cooperative commencing its existence with the shares allocated to 21 of the 101 apartments in the building remaining unsold. Since the device of the "nominee" of the selling corporation taking over these 21 vacant apartments is not permissible in order to bridge this gap, the occupants of the remaining apartments are necessarily in the unfortunate position of having become tenant-stockholders before their cooperative was able to qualify as a "cooperative housing corporation" under the tax laws.

The Plan of Organization pursuant to which the cooperative corporation was organized by its sponsor corporation specifically stated that tenant-stockholders would receive their income tax deductions "when 80 percent of the income of the Apartment Corporation [the cooperative] consists of rent received from tenant-stockholders," and, as shown, the proprietary leases specifically excluded the mortgage principal portion of the rent from the cooperative's "income," so that the tenants were all fully apprised of the existence of the 80-percent requirement and the relationship of their rental payments to it. Every prospective tenant-stockholder received a copy of the Plan (and, of course, the proprietary lease, which the lessee had to sign) prior to his stock purchase. The Plan further warned that neither the sponsor nor the corporative corporation made any warranty or representation that the Government would hold that the cooperative met the requirements imposed by the statutes for eligibility as a cooperative housing corporation. Under the circumstances, therefore, the tenant-stockholders cannot fairly claim surprise con-

cerning the existence of the 80-percent requirement, upon which their tax status depended.

For the reasons indicated, plaintiff is not entitled to recover.

59 CCPA

### Application of Gerard R. KAMM and Charles H. Young.

### Patent Appeal No. 8562.

United States Court of Customs and Patent Appeals.

Jan. 13, 1972.

R. J. Eichelburg, New York City, attorney of record, for appellants; L. C. Smith, New York City, Paul A. Rose, Washington, D.C., of counsel.

S. Wm. Cochran, Washington, D.C., for the Commissioner of Patents; Jack E. Armore, Washington, D.C., of counsel.

Before WORLEY, Chief Judge, and RICH, ALMOND, BALDWIN and LANE, Judges.

LANE, Judge.

This is an appeal from the decision of the Board of Appeals affirming the examiner's final rejection of claims 1–13 and 18–65 of appellants' application serial No. 347,672, filed February 27, 1964, on "Inhibition of Polymerization on Molecular Sieves." At oral hearing, counsel for appellants withdrew claims 1–4, 27–30, 40–43 and 53–56 from appeal, and the appeal as to those claims is accordingly dismissed. This leaves the rejection of claims 5–13, 18–26, 31–39, 44–52 and 57–65 for our consideration. We reverse.