THE EDISON CLUB, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Edison Club v. Commissioner
Docket No. 7828-71.
United States Tax Court
T.C. Memo 1975-19; 1975 Tax Ct. Memo LEXIS 351; 34 T.C.M. (CCH) 79; T.C.M. (RIA) 750019; February 6, 1975, Filed Robert A. Fesjian,J. P. Janetatos, and David W. Welles, for the petitioner. Jeffrey L. Davidson and Barry D. Gordon, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent determined deficiencies and a penalty in the petitioner's Federal income tax as follows: Fiscal Year Ended
Deficiency
Addition to Tax
March 31, 1967
$ 4,630.48
$ 463.05
March 31, 1968
18,537.72 The issues presented for our decision are: (1) Whether any amounts received by the Edison Club from its members during the fiscal years ended March 31, 1967 and 1968, were contributions to capital and hence excludable from gross income under section 118; [1]
(2) Whether the petitioner is liable for a penalty for failure to file a return when due for the fiscal year ended March 31, 1967, pursuant to section 6651. *353 FINDINGS OF FACT Some of the facts have been stipulated by the parties. Such facts and the exhibits attached thereto are incorporated herein by this reference. The Edison Club (hereinafter sometimes referred to as "petitioner") is a New York corporation originally organized under the Membership Corporation Law of New York. [2] Its principal office both now and at the time of filing the petition in this case was at Rexford, New York. Petitioner keeps its books and records on the accrual method of accounting and files its returns on a fiscal year ending March 31. For the fiscal years ended March 31, 1967 and March 31, 1968, petitioner filed its income tax returns with the district director of internal revenue at Albany, New York, on October 30, 1967, and on August 28, 1968, respectively. Petitioner owns and operates its facilities as a social and recreational club primarily for the benefit of its members. However, it also derives substantial income from the use of its facilities by non-members. The Club was originally begun for employees of the General Electric Co., but it is now open to others as *354 well. From 1928 until 1968, the petitioner leased the land upon which its facilities are located, first from the General Electric Co., and later from the General Electric Co.'s subsidiary, General Electric Realty Corp. At all times material herein, petitioner's members consisted of regular members, associate members, house members, women members, junior members #1, #2, and #3, and pool members. The right to vote and to hold office was restricted to the regular members. Only the employees of General Electric Co. were admitted as regular members. Pursuant to its constitution, ownership of the Club was vested in the regular members. Section 4241, repealed by Pub. L. 89-44 effective January 1, 1966, imposed a tax of 20 percent of the amounts paid as dues or membership fees to a social, athletic, or sporting club, if the total dues or fees paid exceeded $ 10 per year. Section 4243(b) repealed by Pub. L. 89-44 effective January 1, 1966, exempted from said tax "any amount paid as dues or membership fees or as initiation fees" for certain specific purposes such as construction, reconstruction, capital additions, including furnishings and fixtures relative thereto. As amended by Pub. L. *355 86-344, section 4243(b) provided as follows: (b) Payments for capital improvements. Notwithstanding any other provision of this part, there shall be exempted from the provisions of section 4241 any amount paid as dues or membership fees or as initiation fees-- (1) for the construction or reconstruction of any social, athletic, or sporting facility, or (2) for the construction or reconstruction of any capital addition to, or capital improvement of, any such facility, or (3) for furnishings or fixtures (including installation charges) for any such facility, to the extent that such furnishings or fixtures are required, by reason of the construction or reconstruction described in paragraph (1) or (2), for the use of such facility upon completion of such construction or reconstruction; except that, in the case of any such amount which is not expended for such construction, reconstruction, furnishings or fixtures (including installation charges) within 3 years after the date of payment of such amount, the exemption provided by this subsection shall cease to apply upon the expiration *356 of such 3-year period, and the club or organization, rather than the person who made such payment, shall be liable for any tax imposed by section 4241 in respect of such payment, as if such payment had been made on the first day following the expiration of such 3-year period. The purpose for such exemption was explained in the report of the Committee on Ways and Means as follows: [3]
In the case of the 20 percent club dues tax, the Excise Tax Technical Changes Act of 1958 provided an exemption for assessments for capital improvements. It was indicated that this exemption was granted because the construction or reconstruction of capital facilities represents especially heavy burdens for many clubs and that it was unfortunate to add to this already heavy burden by the imposition of a tax. Experience under this exemption has suggested the desirability of several refinements. First, reference to exemptions only for "assessments" for capital improvements has limited the application of the exemption to dues since the term "dues" is defined as including any assessment. This precludes an exemption for initiation fees even though the amounts collected are used for the construction or reconstruction *357 of otherwise qualifying capital improvements. Second, the exemption is not available in the case of assessments for required furnishings and fixtures since such amounts are not for the "facility" being constructed or reconstructed. Third, there is no indication in the present exemption as to how long after the payment of the assessment the construction or reconstruction may occur, or how specific the plans must be for this construction or reconstruction. In view of these problems section 3 of this bill rewrites this exemption to provide for the problems referred to above. First, it provides an exemption for amounts paid for dues or membership fees or as initiation fees (instead of referring only to assessments which relate only to dues). Second, it provides an exemption not only in the case of the construction or reconstruction of a social, athletic, or sporting facility or for a capital addition or improvement in such a facility, but also for certain furnishings or fixtures (including installation charges) for such a facility. To qualify the furnishings or fixtures must be required by reason of the construction or reconstruction for the use of the facility upon the completion *358 of the work. For example, this would include required furniture, drapes, carpeting, refrigerators, etc., for a new facility, or for any portion of an existing facility which is reconstructed. Third, the exemption is limited to amounts spent for construction or reconstruction or required furnishings or fixtures within 3 years after the date of payment by the club member. The tax on amounts not so spent becomes payable immediately after the expiration of the 3-year period and in this case is payable by the club rather than the member. The shift in the incidence of the tax in this case is provided because of the problem which would otherwise be presented in attempting to trace back to members of the club 3 years earlier. These changes are made effective for amounts paid on or after the first day of the first month beginning more than 10 days after the date of enactment of this bill. In addition, the amounts paid must be for construction or reconstruction of a facility begun on or after January 1, 1959, or for furnishing or fixtures for such a facility upon its completion. Prior to the repeal of the excise tax on dues *359 effective January 1, 1966, the dues structure of the Club had included from time to time an additional charge designated as an "assessment," the purpose of which was to provide funds for capital improvements and other expenditures on account of which the exemption was provided in section 4243(b). In the letter to the board of directors, dated May 8, 1964, entitled "Capital Financing Report," J. T. Burns, President of the petitioner, outlined requirements totaling $ 32,340 of which $ 17,340 represented repairs and replacements and $ 15,000 represented an insurance premium. To meet these expenditures, Mr. Burns reported, as follows: Initiation fees - 80 at $ 150 each.
$ 12,000.00
This 80 looks like a good figure
because the first month of the year
we had 11. Remember, while we work
on a fiscal year we can talk in terms
of generation of funds for any suc-
ceeding 12 month's period.
The assessment generation would appear as follows: Regular
493 X $ 24
11,832.00
Associate
270 X 24
6,480.00
House
277 X 9
2,493.00
Women &
Seniors
50 X 12
600.00
$ 21,405.00
$ 33,405.00
Now looking at the yearly generation
you will see that we are pretty close
to the total of additional needs of
$ 32,340.00
*360 At a meeting of the board of directors held on February 18, 1965, there was adopted the dues structure to be effective April 1, 1965. This action is set forth in the minutes of said meeting as follows: [4]
Dues Structure - Effective April 1, 1965.
It was duly moved and approved that the following dues structure changes shall be placed in effect starting April 1, 1965. Present Total
Change in
Total * Monthly
Type of
* Monthly
Monthly
Change effective
Membership
Charge
Charge 4/1/65
April 1, 1965
Regular
20.00
+ 3.00
23.00
Associate
24.00
+ 2.00
26.00
House
8.25
8.25
Women
10.75
10.75
Senior
10.75
10.75
Honorary
Women-Affiliate
10.75
10.75
Junior #1
2.50
2.50
Junior #2
1.50
1.50
Junior #3
1.00
1.00
Swimming Pool
4.00
4.00
At said meeting of February 18, 1965, there *361 was also considered a proposal for a proposed increase in the dues structure to become effective April 1, 1966. This action is set forth in the minutes of said meeting as follows: Anticipated change in total charges, effective April 1, 1966.
It was duly moved and approved that the membership be advised by letter from the President of the above changes in dues structure (Item A, 3) and further, that the Board currently anticipates that the agreement between The Edison Club and G.E. Realty Corp. for the purchase of The Edison Club properties will be finalized on or about April 1, 1966, and that the current Board anticipates that an additional change to the dues structure at that time, bringing both Regular and Associate total monthly charges to $ 27.00 per month will be required, as a maximum to accomplish the purchase and maintain the property in a sound physical and financial condition. The final determination of the dues structure to go into effect on April 1, 1966 will of course be the decision of the existing Board of Directors in February, 1966. By letter dated March 8, 1965, under the letterhead of "The Edison Club," which was sent to each member, Mr. J. T. Burns, President, *362 advised the members as follows: Dear Member: With the conversion of the Trophy Room to a formal dining room area we have now completed the projects included in my letter to you about a year ago. The Club facilities and the grounds are now in excellent condition for the coming year with the exception of the tree damage resulting from the December fourth ice storm. So that we may maintain the natural beauty of the golf course it becomes necessary to seek professional aid in the pruning and care of the trees and shrubbery that were so damaged and quotes and estimates have been received and are being evaluated. As we advised you at the annual meeting in January, the requirements of additional funds with which to purchase the Club facilities from the General Electric Company necessitate a dues and assessment increase as of April 1, 1965. There are secondary considerations affecting this increase but they have an equivalent degree of necessity. Included among these are the pure cost of maintenance at current operating levels which represent an increase over prior years' cost of salary increases and cost of material increases; capital improvements, a continuing demand of any country *363 club and our progressive moves toward creating a "closed" club. Extensive studies have been made to develop figures which would generate the needed funds but minimize adversities with respect to membership. We are not seeking to create a surplus or to move in the direction of a luxury club. Our figures are based on a price which as yet has not been finalized but the Board feels it expedient to put this increase into effect immediately so as to produce the equity money essential to the ultimate acquiescence, i.e., a down payment. * * * With all these factors in mind then we have come up with a dues structure, copy of which is attached. It is predicated on a two step increase, the first of which would be effective April first of this year and the second one year hence, subject to further Board review and approval. The schedule is self-explanatory. As usual we welcome your comments. We will be mailing out the membership cards sometime later in the month. Yours very truly, /s/ J. T. Burns President As set forth therein, there was attached to said letter the dues, assessments, and tax to be charged to the members for the fiscal year beginning April 1, 1965 and the proposed *364 charges for the fiscal year beginning April 1, 1966, as follows: EDISON CLUB
Dues Structure Effective 4/1/65
Per Month
Excise Tax
Type of Membership
Dues
on Dues
Assessment
Total
Regular
$ 15.83
$ 3.17
$ 4.00
$ 23.00
Associate
18.33
3.67
4.00
26.00
House
6.25
1.25
.75
8.25
Women
8.13
1.62
1.00
10.75
Women affiliate
8.13
1.62
1.00
10.75
Senior
8.13
1.62
1.00
10.75
Junior card #1
2.08
.42
2.50
Junior card #2
1.25
.25
1.50
Junior card #3
.83
.17
1.00
Swimming pool
3.33
.67
4.00
Proposed Dues Structure To Be Effective
4/1/66
Regular
$ 19.17
$ 3.83
$ 4.00
$ 27.00
Associate
19.17
3.83
4.00
27.00
House
6.25
1.25
.75
8.25
Women
8.13
1.62
1.00
10.75
Women affiliate
8.13
1.62
1.00
10.75
Senior
8.13
1.62
1.00
10.75
Junior card #1
2.08
.42
2.50
Junior card #2
1.25
.25
1.50
Junior card #3
.83
.17
1.00
Swimming pool
3.00
.67
4.00
EDISON CLUB
Dues Structure Effective 4/1/65
Per Year
Excise Tax
Initiation
Type of Membership
Dues
on Dues
Assessment
Total
Fee
Regular
$ 190.00
$ 38.00
$ 48.00
$ 276.00
$ 200.00
Associate
220.00
44.00
48.00
312.00
200.00
House
75.00
15.00
9.00
99.00
150.00-a)
Women
97.50
19.50
12.00
129.00
200.00
Women affiliate
97.50
19.50
12.00
129.00
200.00
Senior
97.50
19.50
12.00
129.00
Junior card #1
25.00
5.00
30.00
Junior card #2
15.00
3.00
18.00
Junior card #3
10.00
2.00
12.00
Swimming pool
40.00
8.00
48.00
36.00
Proposed Dues Structure To Be Effective 4/1/66
Regular
$ 230.00
$ 46.00
$ 48.00
$ 324.00
$ 200.00
Associate
230.00
46.00
48.00
324.00
200.00
House
75.00
15.00
9.00
99.00
150.00-a)
Women
97.50
19.50
12.00
129.00
200.00
Women affiliate
97.50
19.50
12.00
129.00
200.00
Senior
97.50
19.50
12.00
129.00
Junior card #1
25.00
5.00
30.00
Junior card #2
15.00
3.00
18.00
Junior card #3
10.00
2.00
12.00
Swimming pool
40.00
8.00
48.00
36.00
*365 (a- House members joining after 4/1/65 who later transfer to regular membership will be liable for the difference in initiation fees between these two types of membership. During this period, representatives of the Club were attempting to initiate negotiations with the General Electric Realty Corp. for the purchase of the real property used by the Club. In the minutes of the annual meeting, held December 3, 1965, the following is reported: President Burns then answered questions from the floor regarding: A. Equalization of Dues - up to the Board of Directors in accordance with the Constitution, Article VIII; and that it was felt that regardless of the outcome of the balloting, that there was strong sentiment on the current Board of Directors to equalize the Dues, and that equalization might be accomplished at a lower level than previously contemplated because of the repeal of the twenty (20) percent Excise Tax scheduled for repeal on January 1st, 1966. B. Future Income Tax - estimated at about one thousand ($ 1,000) per year not counting the fact that in 1966 the money now exempt from tax received as Excise Tax, would now be income. C. Cash Accrual for Club Purchase - estimated *366 at approximately fifty thousand dollars ($ 50,000) now and approximately eighty thousand ($ 80,000) by the end of 1966. The Club plans to mortgage and has received assurance from several banks that they are eager to provide the mortgage funds. On December 21, 1965, the petitioner was advised that its qualification for exemption from Federal income tax as an organization defined in section 501(c)(7) was revoked for all taxable years subsequent to March 31, 1959. A meeting of the board of directors was held on February 10, 1966. The following appears in the minutes of that meeting: Club Purchase - Escrow Account
J. T. Burns stated he had been in contact with R. L. Yowell, concerning a meeting to discuss the purchase of the Club. Due to the press of business, Mr. Yowell requested a deferment of the meeting until late in February or early March. J. T. Burns will again contact Mr. Yowell the last week in February if nothing further has been heard by that time. J. T. Burns and F. A. Pasley were authorized to open an interest bearing savings account in escrow at the Schenectady Trust Company, which will be used for the deposit of the monthly excise tax saving. The escrow will *367 be earmarked for the down payment of the purchase price. The escrow will be established retroactive to January 1, 1966. The first deposit will be $ 3,390 which is the savings in excise tax realized in January 1966. A meeting of the board of directors was held on March 10, 1966. The following appears in the minutes of that meeting: Minutes of Meeting, February 10, 1966
The February Minutes were amended as follows: a. Paragraph A-6, Page 3 - A Club Purchase escrow account has been opened in the Schenectady Savings Bank, not The Schenectady Trust Company as noted in the February Minutes. b. Paragraph A-6, Page 3 - The first deposit in the escrow account was in the amount of $ 5,502, rather than $ 3,390. Deposits in this account will be limited to savings on the Excise Tax on Club Dues and Initiation Fees only. [5]
The proposed dues structure to be effective April 1, 1966, which had been transmitted to the members by letter dated March 8, 1965, was *368 not adopted for the fiscal year beginning April 1, 1966. As a result of the repeal of the excise tax, the board of directors apparently concluded that sufficient funds would be available without an increase in the dues. During the fiscal year beginning April 1, 1966, the members were billed on the basis of the total charges set forth in the dues structure which became effective April 1, 1965, notwithstanding repeal of the excise tax. The records submitted by the petitioner failed to disclose any action by the board of directors approving said schedule of charges or advising the members with respect to any amount therein which represented a contribution to capital or assessment either for the purpose of capital replacement or for the purpose of the purchase of the club property. A meeting of the board of directors was held on April 21, 1966. The following appears in the minutes of that meeting: Budget - 1966-67
The final 1966-67 budget was presented to the Board by Treasurer, F. A. Pasley. The Budget forecasts gross revenues of $ 349,410, expenses of $ 283,415, and a net income before Federal Taxes of $ 65,995. Comparable actual figures for the past twelve months are net *369 revenue, $ 312,074, expenses $ 284,679 and net income $ 27,395, before Federal Income Tax. The Budget was approved. Capital Improvement Budget
Capital Improvement Budget items were approved as follows: Aerifying machine
$ 1,500 Already purchased
Pool Repairs
7,000 Under Contract
Ballroom a/c unit
1,200 Under Contract
Cushman Truck
1,400 On Order
Mower
1,700
Pool Chairs
750
Ballroom Tables
930
New Power-Line to
Control House
900 O.K. if needed
Sidewall Lights-Ballroom
400 O.K. - Get pro-
fessional adv.
Foyer Renovation
? Get Culver to
present plan
Resurface Parking Lot
- Hold in abeyance
An annual meeting of the members of the Club was held on December 2, 1966. At that meeting, the following report was received: Status of Negotiations on the Club Purchase - G.E. Company had just made offer to sell Club for $ 500,000 and assume 25 year mortgage at the prime interest rate enjoyed by the Company. The Negotiating Committee is considering the offer and will make a counter offer. A meeting of the board of directors was held on February 9, 1967. The following appears in the minutes of that meeting: Budgets - 1967
Walter Kleczek *370 reviewed the preliminary budgets explaining the highlights of the proposals. The Board was asked to carefully review the proposed budgets. In the meantime, all budgets will be revised and returned to Walter Kleczek by February 17, 1967. The Board shall meet at 7:30 P.M., February 23, 1967, to review the revised budgets. All Board Members were asked to carefully review the dues structure. [6]
A meeting of the board of directors was held on February 23, 1967. The following appears in the minutes of that meeting: Dues Structure
After careful consideration of the higher operating costs of the Club, the decrease in membership and the lower net income from the Restaurant operation, Schedule "D" of the dues structure was accepted by the Board. A letter shall be drafted and sent to the members explaining the reasons for the dues increase. By letter dated March 9, 1967, under the letterhead of "The Edison Club," which was sent to each member, Mr. John T. Miller, President, *371 advised the members as follows: Dear Member: The same increases in the cost of living and doing business which affect you, as you might reasonably expect, are also felt by The Edison Club in conducting its operations. The increases in the cost of supplies, equipment, taxes, and labor ($ 5,000/yr for three years starting in 1966) together with the continuing need to accumulate funds for the down payment needed for the Club purchase, have all combined to require your Board of Directors to establish the attached new schedule of dues, to become effective April 1st, 1967. The Board of Directors has studied the needs of the Club and its anticipated status over the next several years very extensively before arriving at its decision. All department budgets submitted were reviewed and pared to minimum limits consistent with good business practice. Several dues structures were developed and analyzed before this one was selected. The new dues structure has been designed, without placing an undue burden on the membership, to meet the Club's needs to: 1. Maintain our facilities and equipment with only modest improvements over the next eighteen to twenty four months, and, 2. Meet our scheduled *372 cost increases, principally the cost of labor, while we, 3. Accumulate the necessary down payment and accomplish the Club purchase - and then 4. Permit your Board of Directors to initiate some of the major improvement programs which you have expressed a desire for. You will note that the attached dues schedule is identical with the one which had been scheduled to go into effect April of 1966 with two exceptions. The dues structure for Women and Seniors has been adjusted to one-half of the rate established for Regular and Associate Members, and the rate for Juniors has been established at approximately one-eight [sic] of the Regular and Associate rate. The Junior rates apply, as in the past, only to those Juniors who wish to play without being accompanied by a parent. Our Office staff is currently busily engaged in preparing membership cards for the coming year and I urge you to return your questionnaire for family cards if you have not already done so. Bob Mitchell, our Manager of Golf and Facilities, currently vacationing with his son in San Diego, advised me before he left that the course seems to have wintered very well, and that we can all look forward to an even finer *373 golf course this year. In behalf of the entire Board, I would like to extend to you and your families our best wished [sic] for a most enjoyable 1967 Club season. Your membership cards will be seperately [sic] mailed to you during the month, and as usual we welcome your comments regarding any phase of Club operation and policy. Yours very truly, /s/ John P. Miller, President 1967 - 68 The dues schedule which was attached to said letter setting forth the charges for the members for the fiscal year beginning April 1, 1967, was as follows: THE EDISON CLUB
Dues Structure Effective 4/1/67
(Per Month)
Category
Dues
St. Tax
Total Dues
Regular
27.00
.54
27.54
Associate
27.00
.54
27.54
House
8.25
.17
8.42
Women
13.50
.27
13.77
Senior
13.50
.27
13.77
Junior # 1
3.50
.07
3.57
2
1.50
.03
1.53
3
1.00
.02
1.02
Pool
4.00
.08
4.08
Initiation Fees
Regular
200.00
4.00
204.00
Associate
200.00
4.00
204.00
House
150.00(a)
3.00
153.00
Women
200.00
4.00
204.00
Pool
36.00
.72
36.72
(a) House members joining after 4/1/65, who later transfer to Regular membership, will be liable for the difference in Initiation *374 Fee between these two classes of membership. A meeting of the board of directors was held on March 9, 1967. The following appears in the minutes of that meeting: Budgets
With some minor changes, all budgets were approved. Walter Kleczek to revise the budgets with the approved changes included. The revised budgets are to be sent to all Board Members. Salaries changes were approved and should be included in the revised budgets. At all times material herein, to and including the fiscal year ended March 31, 1968, the members were required as a condition of membership to pay the dues and other charges in accordance with the schedule of dues approved by the board of directors. Regular members, being employees of General Electric Co., could elect to have the said payment deducted from their salary by General Electric Co. and paid directly to the Club. For members so electing, the amount deducted was noted on their payroll stub under the heading "Edison Club." Other members were billed monthly. Such billings did not show the components of the total monthly charge such as dues, assessment, excise tax, and the like. Dues billings and all other receipts of the Edison Club, regardless *375 of source, were deposited in the Club's general checking account. The records maintained by the Club included a general journal, a cash receipts journal, a cash disbursements journal, a general ledger, and an accounts receivable ledger. The content of these records was, as follows: General Journal - A record showing payables and receivables from the various general ledger accounts. Cash Receipts Journal - A record of receipts by source with selected items, such as food and beverage sales, on account of which the New York State sales tax applied, segregated. Amounts received as dues, assessments, and Federal excise tax on dues (when applicable) were not shown separately in this record. Cash Disbursements Journal - A record of disbursements showing the payee and, in some cases, the purpose for which the funds were disbursed. The nature of the disbursement, whether chargeable to the capital account or to expense, was not shown in this record. The Federal excise tax on dues (when applicable) was shown under a column entitled "Miscellaneous" and identified as "Dues tax." General Ledger - This record consisted of various numbered accounts, including the following: *376 No. 015
Schenectady Savings Bank -
Purchase a/c
No. 200
Plant and Equipment
No. 210
Reserve for Depreciation -
Current Year
No. 220
Reserve for Depreciation -
Previous Years
No. 330
Excise Tax - Collected
Dues, Pool Dues, Locker and
Admission Taxes [7]
No. 500
Club Dues
No. 501
Assessments [8]
No. 503
Club Initiation Fees
No. 510
Dues - Pool
No. 513
Initiation Fees - Pool
Accounts Receivable Ledger - A ledger card was maintained for each member on which were posted the charges incurred by such member for dues, food and beverages, and other activities. During the taxable years involved in this proceeding, the total amount billed as dues was entered on the card as such and a separate entry was made to reflect the New York State tax which *377 amounted to 2 percent. There was no provision on this card to show separately either the Federal excise tax or the so-called "assessments." For the taxable years involved in this proceeding, Account No. 015 - Schenectady Savings Bank - Purchase a/c reflected total debits on account of deposits, as follows: 4/2/67
3/31/68
$ 43,109.95
$ 39,396.31
On March 31, 1968, there was credited to this account the sum of $ 70,000 on account of a withdrawal for the purpose of making the downpayment on the purchase of the Club's property, leaving a balance as of March 31, 1968, of $ 12,506.26. During the taxable year ended March 31, 1969, additional debits totaled $ 23,012.57, resulting in a balance of $ 35,518.83. There were no further withdrawals. For the taxable years involved in this proceeding, Account No. 501 - Assessments reflected credits on account of the amounts which petitioner claims as a contribution to capital, as follows: [9]
4/2/67
3/31/68
$ 38,925.48
$ 38,354.82
For the taxable years involved in this proceeding, Account No. 200 - Plant *378 and Equipment reflected total debits on account of capital expenditures or additions, as follows: 4/2/67
3/31/68
$ 22,708.69
$ 23,390.72 This account also reflected credits on account of the retirement of capital assets (scrapping, trade in, etc.), as follows: 4/2/67
3/31/68
$ 8,933.23
$ 17,925.40
For the taxable years involved in this proceeding, Account No. 210 - Reserve for Depreciation - Current Year shows total credits, as follows: 4/2/67
3/31/68
$ 35,182.17
$ 33,709.51
In the General Journal, the credits to Account No. 210 - Reserve for Depreciation - Current Year were charged as an expense to the various operations of the Club. In order to avoid duplication of the credits to the reserve, a closing entry in the General Journal transferred the total depreciation reflected in this account directly to Account No. 220 - Reserve for Depreciation - Previous Years. A closing entry was entered in the General Journal as of March 31, 1967, transferring from Profit and Loss to Surplus the sum of $ 49,056.58, as follows: 500 Dues
$ 213,740.31
501 Assessments
38,925.48
503 Club Init. Fees
18,384.00
504 Greens Fees
8,170.50
505 Locker Fees
3,277.46
510 Dues - Pool
34,718.00
513 Init. Fees Pool
2,556.00
514 Pool Fees
2,596.25
515 Other Income
2,317.84
520 Restaurant Sales Food
162,275.82
521 Liquor
95,471.89
522 Beer
12,474.87
523 Misc.
1,500.75
524 Cash o/s
$ 41.54
530 Hall Rental
2,069.82
600 S. Pool
29,285.11
601 Golf Course M.
60,601.70
602 House Op.
58,383.69
603 Admin.
20,107.70
604 Rent
19,222.20
605 Prop. & School Tax
16,269.77
606 Taxes - S.S., N.Y.S. & Fed.
15,794.12
607 Buildings
17,869.39
608 Insurance
10,180.96
609 Publicity
1,414.32
610 Golf Comm.
1,887.06
611 Jr. Activities
805.30
612 Athletic Comm.
131.14
613 Entertainment
7,262.11
614 Pro Shop
8,075.85
615 Grounds - Tennis Rink
5,611.69
616 Miscellaneous Exp.
947.41
616A Interest Expense
2,003.09
617 Retirement - Club P.
6,919.64
619 Restaurant Purch Food
103,817.90
620 Liquor
40,481.68
621 Beer
7,208.87
622 Misc.
1,864.15
623 Supplies
3,553.04
624 Restaurant Payroll K & D
74,911.40
625 Bar
17,693.35
626 Restaurant Expense
17,078.23
420 Profit & Loss
49,056.58
420 Profit & Loss
$ 49,056.58
410 Surplus
$ 49,056.58
*379 A closing entry was entered in the General Journal as of March 31, 1968, transferring from Profit and Loss to Surplus the sum of $ 61,186.58, as follows: 500 Club Dues
$ 238,785.39
501 Assessments
38,354.82
503 Club Initiation Fee
19,040.00
504 Green Fees
8,543.00
505 Locker Fees
3,482.40
510 Dues - Pool
32,992.00
513 Pool Initiation Fees
3,240.00
514 Pool Fees
2,227.50
515 Other Income
4,874.86
520 Restaurant Sales - Food
181,668.15
521 Liquor
105,803.49
522 Beer
12,260.33
523 Mis.
1,327.80
524 Restaurant Cash o/s
51.81
530 Hall Rental
2,597.48
600 Swimming Pool
$ 30,360.84
601 Golf Course Maint.
63,547.15
602 House Operation
61,921.78
603 Administrative
21,095.91
604 Rent
18,967.41
605 Property & School Taxes
21,421.92
606 Taxes - S.S., N.Y.S. & Fed.
16,439.87
607 Building Maint.
25,011.73
608 Insurance
10,465.31
609 Publicity
1,189.87
610 Golf Activities - Expense
2,328.70
611 Junior Activities
367.24
612 Athletic Committee
525.61
613 Entertainment
8,906.44
614 Pro Shop
8,690.02
615 Grounds, Tennis, Rink
6,580.84
616 Mis. Expense
9,169.90 [10]
616A Interest Expense
$ 1,188.58
617 Retirement (Club P.)
7,420.62
619 Restaurant Purchaser - Food
113,344.45
620 Liquor
40,760.86
621 Beer
6,584.65
622 Mis.
1,825.72
623 Supplies
4,437.22
624 Res. K & D Payroll
77,064.19
625 Bar Payroll
17,823.95
626 Rest. Expense
16,621.67
420 Profit & Loss
61,186.58
To close Income and Expense
to Profit & Loss
420 Profit & Loss
$ 61,186.58
410 Surplus
61,186.58
To close Profit & Loss to
Surplus
*380 A Balance Sheet and Statement of Revenue and Expenses was prepared each year for distribution to the membership. [11] For the years involved in this proceeding, said financial statements included the following: THE EDISON CLUB
BALANCE SHEET (FINAL)
PERIOD ENDED April 2, 1967
MARCH
FEBRUARY
CURRENT ASSETS
Cash-General Operating
18 959
12 463
Cash-Savings Banks
15 601
14 527
Cash-Purchase A/C
43 110
39 149
Accounts Receivable
Members
38 484
29 123
Less Res. for Bad Debts
(1 046)
(1 046)
Other
5 183
3 158
Restaurant Inventory
14 179
14 831
Total Current Assets
134 741
112 205
Plant & Equipment
597 167
606 100
Less Res. for Depreciation
(317 844)
(323 581)
Prepaid Expenses
11 962
13 517
TOTAL ASSETS
425 755
408 241
LIABILITIES & EQUITY
Current Liabilities:
Accounts Payable
9 832
11 314
Taxes Accrued
2 136
1 727
Interest Accrued
1 110
965
Other Accrued Liabilities
1 458
1 346
Notes Payable (1 year)
1 250
2 500
Deferred Income
14 070
6 504
Sundry Creditors
12 602
8 017
Federal Income Tax Accrued
3 659
3 659
Total Current Liabilities
46 117
36 032
LONG TERM LIABILITIES
Notes Payable
25 000
25 000
Bonds Payable
43 325
43 325
Total Long Term Liabilities
68 325
68 325
CLUB EQUITY
Surplus
262 256
262 256
Net Addition to Surplus, Year-to-Date
49 057
41 628
Total Surplus & Equity
311 584
303 884
TOTAL LIABILITIES & EQUITY
425 755
408 241
*381 THE EDISON CLUB
STATEMENT OF REVENUE AND EXPENSES
PERIOD ENDED APRIL 2, 1967
Month of March
12 Months, Year-to-
Date
Actual
$ V.B.
Actual
$ V.B. REVENUE
Club Dues
16 541
(1 459)
213 740
(7 288)
Club Initiation Fees
1 000
( 500)
18 384
3 384
Club Assessment
3 085
( 165)
38 925
(1 113)
Pool Dues
2 728
( 222)
34 718
(1 282)
Pool Initiation Fees
36
( 144)
2 556
756
Restaurant (Net)
( 910)
(2 353)
7 145
(13 199)
All Other-Golf Fees
-0-
-0-
8 170
( 830)
Locker Rent
-0-
-0-
3 277
( 23)
Pool Fees
-0-
-0-
2 596
( 104)
Sundry & Interest
2 232
2 132
2 318
2 118
Total Revenue
24 712
(2 711)
331 829
(17 581)
EXPENSES
Swimming Pool
1 392
( 73)
29 285
2 240
Golf Course Maintenance
2 505
( 497)
60 602
96
House Operation
4 766
( 340)
58 384
(1 657)
Administrative
1 500
( 265)
20 107
( 109)
Building Maintenance
1 158
( 845)
17 870
1 138
Rent
1 602
-0-
19 222
-0-
Texes
2 282
( 218)
32 063
724
Insurance
( 235)
(1 635)
10 181
(2 153)
Activity Expense
967
332
11 500
160
Pro Shop
88
88
8 076
( 32)
Grounds Maintenance
163
3
5 612
(1 590)
Retirement Plan
648
48
6 920
(1 105)
All Other
448
393
2 950
1 645
Total Expenses
17 284
(3 009)
282 772
( 643)
NET INCOME
7 428
298
49 057
(16 938)
*382 THE EDISON CLUB
SUMMARY OF RESTAURANT OPERATIONS
PERIOD ENDED APRIL 2, 1967
Month of March
12 Months,
Year-to-Date
Actual
$ V.B.
% of
Actual
$ V.B.
% of
SALES
Sales
Sales
Food
9 454
1 454
60.98
162 276
16 276
59.72
Liquor
5 472
472
35.29
95 472
8 972
35.14
Beer
522
122
3.37
12 475
1 175
4.59
Miscellaneous
56
( 44)
.36
1 501
301
.55
Total Sales
15 504
2 004
100.00
271 724
26 724
100.00
COST OF GOODS SOLD
Food
5 779
1 379
61.13
103 818
17 183
63.97
Liquor
2 201
201
40.22
40 482
6 782
42.40
Beer
264
44
50.57
7 209
886
57.79
Miscellaneous
102
2
182.14
1 864
664
(130.85)
Total Cost
8 346
1 626
53.83
153 373
25 515
56.44
GROSS MARGIN
Food
3 675
75
38.87
58 458
( 907)
36.03
Liquor
3 271
271
59.78
54 990
2 190
57.60
Beer
258
78
49.43
5 266
289
42.21
Miscellaneous
( 46)
( 46)
(82.14)
( 363)
( 363)
(30.85)
Total Margin
7 158
378
46.17
118 351
1 209
43.56
GENERAL EXPENSES
Salaries & Wages
5 520
1 200
35.60
92 605
13 205
34.08
Supplies
292
142
1.88
3 353
413
1.31
Laundry
357
( 43)
2.30
5 651
( 123)
2.08
Kitchen & Table
1 193
1 143
7.70
2 659
477
.98
Depreciation
566
289
3.65
3 613
289
1.33
Vehicle Operation
74
54
.49
581
343
.21
Rental & Repair
78
58
.50
1 371
733
.51
Other
31
( 69)
.20
3 202
50
1.18
Total Expenses
8 111
2 774
52.32
113 235
15 387
41.68
INCOME FROM SALES
( 953)
(2 396)
(6.15)
5 116
(14 178)
1.88
OTHER INCOME
Hall Rental
49
49
.32
2 070
1 020
.76
Cash Over/Short
( 6)
( 6)
( .04)
( 41)
( 41)
( .01)
Total Other Income
43
43
.28
2 029
979
.75
NET INCOME
( 910)
(2 353)
( 5.87)
7 145
(13 199)
2.63
*383 [See Table In Original Source.] FINAL STATEMENT
THE EDISON CLUB
STATEMENT OF REVENUE AND EXPENSES
PERIOD ENDED MARCH 31, 1968
Month of March
12 Months,
Year-to-Date
REVENUE
Club Dues & Assessments
21 950
(1 470)
277 140
( 7 290)
Club Initiation Fees
2 488
1 088
19 040
4 040
Pool Dues
2 594
( 106)
32 992
( 1 904)
Pool Initiation Fees
396
216
3 240
1 440
Restaurant (Net)
( 1
(1 809)
25 245
11 746
245)
All Other-Golf Fees
-0-
-0-
8 543
543
Locker Rent
-0-
-0-
3 482
262
Pool Fees
-0-
-0-
2 228
( 272)
Sundry & Interest
2 563
2 463
4 875
4 675
Total Revenue
28 746
382
376 785
13 240
EXPENSES
Swimming Pool
2 493
1 016
30 361
1 767
Golf Course Maintenance
2 792
( 723)
63 547
( 2 384)
House Operation
5 057
82
61 922
( 109)
Administrative
1 633
( 358)
21 096
( 307)
Building Maintenance
6 852
5 454
25 012
7 720
Rent
1 281
( 321)
18 967
( 255)
Taxes
3 462
568
37 862
3 167
Insurance
( 11)
(1 497)
10 465
( 2 021)
Activity Expense
1 733
873
13 318
518
Pro Shop
( 10)
( 10)
8 690
710
Grounds Maintenance
272
( 128)
6 580
( 1 023)
Retirement
440
( 262)
7 421
( 904)
Other
2 375
2 260
10 363
9 058
Total Expenses
28 369
6 954
315 604
15 937
NET INCOME
377
(6 572)
61 181
( 2 697)
*384 FINAL STATEMENT
THE EDISON CLUB
SUMMARY OF RESTAURANT OPERATIONS
PERIOD ENDED MARCH 31, 1968
Month of March
12 Months,
Year-to-Date
Actual
$ V.B.
% of
Actual
$ V.B.
% of
Sales
Sales
SALES
Food
10 552
3 552
56.52
181 668
29 668
60.35
Liquor
7 676
3 176
41.11
105 803
19 303
35.14
Beer
364
( 36)
1.95
12 260
1 060
4.07
Miscellaneous
79
29
.42
1 328
228
.44
Total Sales
18 671
6 721
100.00
301 059
50 259
100.00
COST OF GOODS SOLD
Food
7 301
3 101
69.19
113 344
20 519
62.39
Liquor
2 593
793
33.78
40 761
6 831
38.53
Beer
273
33
75.00
6 585
292
53.71
Miscellaneous
94
44
118.99
1 826
726
(137.50)
Total Cost
10 261
3 971
54.96
162 516
28 368
53.98
GROSS MARGIN
Food
3 251
451
30.81
68 324
9 149
37.61
Liquor
5 083
2 383
66.22
65 042
12 472
61.47
Beer
91
( 69)
25.00
5 675
768
46.29
Miscellaneous
( 15)
( 15)
(18.99)
( 498)
( 498)
37.50
Total Margin
8 410
2 750
45.04
138 543
21 891
46.02
GENERAL EXPENSES
Salaries & Wages
6 293
2 109
33.71
94 888
8 669
31.52
Supplies
195
45
1.04
4 437
1 202
1.47
Laundry
386
36
2.07
5 911
596
1.96
Kitchen & Table
2 669
2 619
14.29
3 766
1 816
1.25
Depreciation
222
-0-
1.19
2 664
-0-
.89
Vehicle Operation
24
9
.13
50
( 165)
.01
Rental & Repair
42
17
.22
962
282
.32
Other
98
( 2)
.53
3 269
94
1.09
Total Expenses
9 929
4 833
53.18
115 947
12 494
38.51
INCOME FROM SALES
(1 519)
(2 083)
( 8.14)
22 596
9 397
7.51
OTHER INCOME
Hall Rental
279
279
1.49
2 597
2 297
.86
Cash Over/Short
( 5)
( 5)
( .02)
52
52
.02
Total Other Income
274
274
1.47
2 649
2 349
.88
NET INCOME OR LOSS
(1 245)
(1 809)
( 6.67)
25 245
11 746
8.39
*385 On August 28, 1967, petitioner by letter extended an offer to the General Electric Realty Corp. to purchase the Edison Club property. The offer was accepted on December 29, 1967. On or about March 27, 1968, petitioner withdrew the sum of $ 70,000 from the savings account in the Schenectady Savings Bank to make a downpayment on the purchase price of the club property. In computing its gross income for the fiscal year ended March 31, 1967, petitioner included $ 25,025 from a source it denominated as "club assessments" thereby excluding $ 13,900.48 of the total of $ 38,925.48 credited to "Account No. 501 Assessments" for that year. [12] That return was filed on October 30, 1967. For the fiscal year ended March 31, 1968, petitioner excluded the total of $ 38,354.82 credited to "Account No. 501 Assessments" for that year. In his notice of deficiency, the respondent determined that for the fiscal year ended March 31, 1967, the income of the petitioner should include so-called "assessments" in the amount of $ 38,925 in lieu of the $ 25,025 reported on the return and that for the fiscal year ended *386 March 31, 1968, income of the petitioner should include so-called "assessments" in the amount of $ 38,355. He also determined that a penalty of $ 463.05 was due pursuant to section 6651 on account of the Club's failure to file a timely return for the fiscal year ended March 31, 1967. OPINION The petitioner is a nonstock membership corporation organized under the laws of the State of New York as a social and recreational club. Petitioner concedes that during the taxable years ending March 31, 1967 and 1968, petitioner did not qualify as an organization exempt from tax under section 501. This proceeding relates solely to the determination of the income to be taxed. The petitioner argues that certain amounts credited to an account designated "No. 501 Assessments" should be excluded in computing taxable income as a contribution to capital within the meaning of section 118. We find this position wholly lacking in merit. Section 118 provides that "gross income does not include any contribution to the capital of the taxpayer." [13] The section was embodied in the initial enactment of the Internal *387 Revenue Code of 1954 (Pub. L. No. 591, 83d Cong., 2d Sess., (August 16, 1954)). In explanation thereof, the report of the Committee on Ways and Means states: [14]
H. Contributions to the capital of a corporation (secs. 118,355)
Your committee's bill provides that in the case of a corporation, gross income is not to include any contribution to the capital of the taxpayer. This in effect places in the code the court decisions on this subject. It deals with cases where a contribution is made to a corporation by a governmental unit, chamber of commerce, or other association of individuals having no proprietary interest in the corporation. In many such cases because the contributor expects to derive indirect benefits, the contribution cannot be called a gift; yet the anticipated future benefits may also be so intangible as to not warrant treating the contribution as a payment for future services. *388 In section 1.118-1, Income Tax Regs., the respondent defines a contribution to the capital of a corporation as follows: § 1.118-1 Contributions to the capital of a corporation. In the case of a corporation, section 118 provides an exclusion from gross income with respect to any contribution of money or property to the capital of the taxpayer. Thus, if a corporation requires additional funds for conducting its business and obtains such funds through voluntary pro rata payments by its shareholders, the amounts so received being credited to its surplus account or to a special account, such amounts do not constitute income, although there is no increase in the outstanding shares of stock of the corporation. In such a case the payments are in the nature of assessments upon, and represent an additional price paid for, the shares of stock held by the individual shareholders, and will be treated as an addition to and as a part of the operating capital of the company. Section 118 also applies to contributions to capital made by persons other than shareholders. For *389 example, the exclusion applies to the value of land or other property contributed to a corporation by a governmental unit or by a civic group for the purpose of inducing the corporation to locate its business in a particular community, or for the purpose of enabling the corporation to expand its operating facilities. However, the exclusion does not apply to any money or property transferred to the corporation in consideration for goods or services rendered, or to subsidies paid for the purpose of inducing the taxpayer to limit production. See section 362 for the basis of property acquired by a corporation through a contribution to its capital by its stockholders or by nonstockholders. The petitioner cites cases such as Minnequa University Club,T.C. Memo. 1971-305; Lake Petersburg Association,T.C. Memo. 1974-55, and the so-called cooperative housing cases (874 Park Avenue Corporation,23 B.T.A. 400 (1931); Cambridge Apartment Building Corporation, 44 B.T.A. 617 (1941); and Eckstein v. United States,452 F. 2d 1036 (Ct. Cl. 1971)) in support of its position and attempts to distinguish others, *390 such as United Grocers, Ltd. v. United States,308 F. 2d 634 (C.A. 9, 1962); James Hotel Co.,39 T.C. 135 (1962), affd. 325 F. 2d 280 (C.A. 10, 1963); and Teleservice Co. of Wyoming Valley,27 T.C. 722 (1957), affd. 254 F. 2d 105 (C.A. 3, 1958), certiorari denied 357 U.S. 919 (1958). The fallacy of the petitioner's reasoning stems not from the law in these cases but from the misconception in petitioner's brief of the facts. In our findings of fact, there have been included any and all references in the minutes of the meetings of the stockholders and the minutes of the meetings of the board of directors of the petitioner which related to the adoption of the so-called "dues structure" charged to its members and, the entries on its books and records of the income derived therefrom. The only inference that the Court is able to draw from this record, coupled with the petitioner's claims, is that upon the repeal of the excise tax the petitioner found it unnecessary to increase its dues and charges for the period beginning April 1, 1966. There had been embodied in the dues structure, which *391 was carried forward from that date, both an "assessment" and a provision for the excise tax on dues. Apparently, the petitioner continued to credit the account designated "No. 501 Assessments" with the amount included in the dues structure as "assessments." At the same time, petitioner opened a special savings account for the purchase of the club property in which there were deposited amounts purporting to be the savings resulting from the repeal of the excise tax. Beginning April 1, 1967, the petitioner proposed a new dues structure reflecting an increase in the totals charged to the various classes of members. It cannot be ascertained from the records whether the amounts credited to the account designated "No. 501 Assessments" for that fiscal year represented the same amount that had been designated as an "assessment" in the prior year, or was related to the savings in the excise tax. However, a different amount was deposited in the savings account, purportedly representing such savings. Although it is impossible from this record to verify the manner in which the amounts deposited in the savings account were computed, if we accept the testimony presented by the petitioner that *392 these amounts represented savings in the excise tax, the Court fails to understand how or why a decision by the board of directors to set aside such savings in a special account would give rise to a contribution to capital within the meaning of section 118. There would be included not only a portion of the dues of those members who had been subject to assessment under the dues structure effective for prior years but also a portion of the dues charged to the junior members and to those paying an annual charge for the use of the swimming pool, neither of whom had been subject to assessment in the past. In the financial statements sent to the members, the savings which resulted from the repeal of the excise tax were included in "Club Dues" and included in income in determining profit and loss. The members were not informed by the board of directors that any portion of the savings resulting from the repeal of the excise tax would be set aside or "earmarked" as a "contribution to capital." The deposit of funds in a savings account, shown on the balance sheet as being maintained for the purchase of the club property, does not of itself give rise to a capital contribution within the meaning *393 of section 118. It would be equally consistent to assume that the amounts thus set aside represented a portion of the net income and cash flow from depreciation. Accordingly, if we look to the deposits in the savings account as a basis for the exclusion from income, the essential elements of notice and assent to the contribution are lacking. Furthermore, if the deposits represented the total savings on account of the repeal of the excise tax, the amounts in question were derived from both proprietary members and limited members having no interest in the Club except as "customers" receiving a service for their monthly charges. If we look to the account designated "No. 501 Assessments" as a basis for the capital contribution, the essentials for such a contribution are likewise lacking. It must be remembered that this account was set up, not for the purpose of excluding assessments from income, but for the purpose of segregating a portion of the dues to be expended for capital improvements in order to minimize the impact of the excise tax on dues. On its books and records, and in the financial statements made available to its members, the amount designated "assessments" was included *394 in income in determining profit and loss. The net profit or loss was transferred to the surplus account. For the fiscal year beginning April 1, 1964, petitioner's president submitted a report to the board of directors outlining the proposed application of initiation fees and assessments to both capital and noncapital expenditures, including an insurance premium. In addition, the record in this case fails to show that the amounts credited to the assessment account were earmarked for any specific purpose. If we look to the letter transmitted to the members by Mr. John T. Miller, President of the Club, under date of March 9, 1967, there are outlined the various purposes for which the "new dues structure" was designed. Such purposes encompassed both costs and operating expenses, as well as the accumulation of funds for the purchase of the club property and the initiation of major improvement programs. The letter did not designate what portion of the dues, if any, would be dedicated to the purposes enumerated therein. As a practical matter, upon the repeal of the excise tax, the petitioner appears to have abandoned any correlation between the funds derived from "assessments" and expenditures *395 for the purposes enumerated in section 4243(b). That question became moot. Petitioner's brief is incorrect in that it states that "the amount set aside as assessments were separately listed on the financial statements that appeared in petitioner's annual meeting notices which went out to all of petitioner's members." The practice of setting forth the assessments separately was discontinued with the repeal of the excise tax and the adoption of the new dues structure effective April 1, 1967. For the fiscal year beginning April 1, 1966, petitioner continued to charge the same amount as dues as in the prior year, notwithstanding the repeal of the excise tax. For the fiscal year beginning April 1, 1967, the petitioner increased the amount of the dues without providing any breakdown with respect to how much, if any, was deemed to be "assessments." In computing its taxable income for the fiscal year ended March 31, 1967, petitioner initially excluded an amount which apparently represented reflected net additions to the plant and equipment account. In this proceeding, petitioner now argues that the full amount credited to the assessment account should be excluded, not on the basis of *396 capital expenditures as described in section 4243(b), but on account of other capital items such as deposits in the savings account and the retirement of swimming pool bonds. However, the minutes indicate that funds for the retirement of such bonds were to be derived from the income generated by the pool, and not from any assessments. In computing its taxable income for the year ended March 31, 1968, petitioner excluded the amount credited to the assessment account without regard to expenditures. It cannot be shown that this amount represented the savings in the excise tax. In fact, the petitioner could not even prove how the amount was computed, or at least failed to do so. A review of the record in this case fails to support the petitioner's claim that its members knowingly made a contribution to the capital of the Club with the understanding that such contribution would be restricted as to its use, whether that restriction related to capital improvements as defined in section 4243(b) or to the purchase of the club property. In adopting the so-called dues structure, there was no commitment to the members with respect to the segregation or expenditure of the revenues resulting *397 therefrom. Furthermore, the petitioner did not restrict itself in the use of such funds. The revenues derived from "assessments." as well as the dues and other charges to its members, were accounted for in the statements to the members as "REVENUE." From this there was deducted the certain costs under the designation "EXPENSES," the difference being reported as "NET INCOME." Upon the repeal of the excise tax, petitioner failed to adjust the charges to its members in order to provide additional funds for the operation of the Club, as well as the purchase of the club property. There was no commitment, however, to dedicate any amount to that purchase. Except for the withdrawal of the downpayment from the savings account in the Schenectady Savings Bank, there have been no payments from this account for any purpose. It cannot be contended, moreover, that the funds accumulated therein could not have been expended at any time to meet operating costs. At most, the record shows that the petitioner decided to keep the savings resulting from the excise tax in order to provide additional funds. The members had no choice in the matter. Although the excise tax applied to all classes *398 of members, only the regular members could have brought the matter to a vote if opposed to this form of an indirect increase in the dues. In its financial statements, the monthly charges by the Club to its various classes of members, whether termed "dues," "assessment," or "excise tax," were treated the same, as revenues received in consideration for goods and services. The elements of a contribution to capital within the meaning of section 118 are wholly lacking. Respondent determined that a penalty of $ 463.05 was due pursuant to section 6651 on account of the Club's failure to file a timely return for the fiscal year ended March 31, 1967. [15]Section 6651(a) imposes a penalty of 5 percent of the outstanding tax liability for each month that the return is late not to exceed a total of 25 percent. To avoid the penalty, the taxpayer must be able to show reasonable cause for the failure to file the return on time. On September 13, 1967, petitioner filed an application for an automatic extension of time pursuant to section 6081(b) within which to file the return. However, petitioner's income *399 tax return for the fiscal year ended March 31, 1967, was not filed until October 30, 1967. Petitioner based its defense on the fact that the penalty was imposed on the deficiency and that no deficiency *400 was owed in this case. Therefore, it presented no evidence to show reasonable cause for the delay. In view of the lack of any such evidence, the determination of the respondent is presumed correct. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. The Membership Corporation Law was repealed effective September 1, 1970.↩
3. H. Rept. No. 992, 86th Cong., 1st Sess., pp. 6-7 (1959).↩
4. In the excerpts from the minutes set forth herein the numbering of the items has been omitted and typographical errors have been corrected.↩
*. Dues and fees are actually on an Annual basis due in full 30 days after April 1st or at the time of election for new members, but are shown on a monthly basis above for convenience.↩
5. The amount credited to the general ledger account No. 501 - Assessments totaled $ 3,273. The Court could not identify any account in the records of the Club from which the sum of $ 3,390 and the sum of $ 5,502 was derived.↩
6. The budgets referred to in these minutes, which might have established more specifically the intent of the board of directors in subsequently adopting the dues structure, were not offered in evidence.↩
7. Upon the repeal of the Federal excise tax on dues, Account No. 330 - Excise Tax was closed out, and the balance of $ 3,434.79 paid to the district director of internal revenue. ↩
8. There was penciled in the designation "Capital Improvements" for this account. However, the monthly financial statements (Ex. 24-X) show that this change in nomenclature was not adopted until after April 1, 1968.↩
9. A closing entry appearing in the General Journal reflecting such credits is set forth below.↩
10. A penciled correction increased the Mis. Expense of $ 9,169.90 by $ 4.50. To balance this, further penciled adjustments decreased the following items by $ 4.50: Account No. 420 - Profit & Loss (to close Income and Expense to Profit & Loss); Account No. 420 - Profit & Loss; Account No. 410 - Surplus (to close Profit & Loss to Surplus).↩
11. It is not clear whether such distribution was made solely to the regular members, who would be called upon to vote, or to other classes of members as well.↩
12. Net additions to Account No. 200 - Plant and Equipment amounted to $ 13,775.46.↩
13. By analogy, sec. 4241 imposed a tax of 20 percent on the amounts paid as dues or membership fees to a social, athletic, or sporting club, if the total dues or fees paid exceeded $ 10 per year. Sec. 4243(b) exempted from said tax "any amount paid as dues or membership fees or as initiation fees" for certain specific purposes such as construction, reconstruction, or capital additions. While the issue before the Court does not relate to that exemption, petitioner apparently initiated a procedure of including "assessments" in its dues structure in order that a corresponding amount expended on capital improvements could be relied upon to provide an exemption from the excise tax for the portion of the dues set aside for such expenditure. Whether the procedures followed by the petitioner were sufficient to entitle it to that exemption, we need not decide. In fact, the applicability of sec. 4243(b) is not limited to "capital contributions" within the scope of sec. 118↩. 14. H. Rept. No. 1337, 83d Cong., 2d Sess., p. 17 (1954).↩
15. SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX. (a) Addition to the Tax.--In case of failure-- (1) to file any return required under authority of subchapter A of chapter 61 (other than part III thereof) subchapter A of chapter 51 (relating to distilled spirits, wines, and beer), or of subchapter A of chapter 52 (relating to tobacco, cigars, cigarettes, and cigarette papers and tubes), or of subchapter A of chapter 53 (relating to machine guns and certain other firearms), on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is not for more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate;↩